**Jeffrey D. GILBERT, Petitioner,**

v.

**MPM ENTERPRISES, INC., Respondent.**

**C.A. No. 14416.**

Court of Chancery of Delaware,
New Castle County.

Submitted: May 21, 1997.
Decided: Sept. 29, 1997.

Allen M. Terrell, Jr. and Srinivas M. Raju of Richards, Layton & Finger, Wilmington, for Petitioner.

Jon E. Abramczyk and William M. Lafferty of Morris, Nichols, Arsht & Tunnell, Wilmington; Richard J. McCarthy of Edwards & Angell, Boston, MA, of counsel, for Respondent.

STEELE, Vice Chancellor.

Shareholder in closely held corporation dissented from approval of merger agreement and arguably perfected his statutory right to appraisal of the fair value of his shares pursuant to 8 *Del. C.* § 262. Petitioner is entitled to the fair value of his shares and compound interest on that fair value from the date of merger to the date of pay-

ment as calculated in accordance with the guidance below.

## I. BACKGROUND

MPM Enterprises ("MPM") manufactures screen printers for the surface mount technology ("SMT") industry. Broadly speaking, the SMT industry transforms bare circuit boards into completed products with electronic components soldered directly onto the surface of printed circuit boards. The equipment used in the industry includes screen printers, which "squeegee" solder paste through screens (stencils) onto bare boards, "pick and place" machines, which automatically select the proper electronic components and mount them on the boards, and several other machines or products necessary for soldering, inspecting and cleaning the boards.

The SMT industry and MPM grew significantly during the 1980s and dramatically in the early 1990s. In fiscal years 1991–1994, MPM's sales increased from $13.5 million to $55.5 million and MPM's net income rose from $8,300 to $6.5 million.[1] In March 1995, MPM and Cookson Group PLC ("Cookson"), a London-based multinational manufacturer and marketer of industrial materials, signed an Agreement of Merger [2] providing for immediate cash payment to MPM's stockholders of $62.698 million with potential earn-out payments up to an additional $73.635 million. MPM merged into a Cookson subsidiary on 2 May 1995.

Petitioner Jeffrey D. Gilbert ("Gilbert"), a former MPM director, owns 600 shares of MPM's common stock and 200 shares of MPM's preferred stock.[3] These shares provided Gilbert with an eight percent ownership of MPM, or 7.273% on a fully diluted basis. If he had accepted the terms of the merger, Gilbert would have received approximately $4.56 million [4], and had the opportunity to receive as much as an additional $5.36 million, if MPM achieved the terms of the earn-out. Despite these prospective payments, Gilbert pursued his statutory right to an appraisal of his shares and filed this action in July 1995 under 8 Del.C. § 262(a), which grants a shareholder of a Delaware corporation, under certain circumstances, the right to obtain a judicial determination of the fair value of his shares. In determining the fair value the Court must consider all relevant factors but exclude "any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value." [5] "Fair value, in an appraisal context, measures 'that which has been taken from [the shareholder], viz., his proportionate interest in a going concern.'" [6]

Typically both sides in an appraisal proceeding present expert opinions on the fair value of the petitioner's shares. In theory, these opinions facilitate judicial fact finding and conclusions by wrapping the experts' factual assumptions in complicated financial models with which they, and usually not the court, are conversant. One might expect the experts' desire to convince the Court of the reasonableness and validity of their assumptions and financial models would produce a somewhat narrow range of values, clearly and concisely supported, despite the individual parties' obvious conflicting incentives.[7]

---

1. RX1 at M00000006 and DX2 at M0000039 (MPM's Consolidated Financial Statements).

2. RX35.

3. Almost half of Gilbert's shares were received through a stock option program and corporate recapitalization. The rest were obtained in exchange for settlement of a lawsuit against MPM in which Gilbert alleged that MPM had promised him a portion of the company's equity. His role as a member of MPM's board of directors began in 1986 and ended with the settlement of the lawsuit in 1989.

4. This $4.5 million is only a gross amount, as transactional costs were deducted from the shareholder payments.

5. 8 Del. C. § 262(h).

6. In the Matter of the Appraisal of Shell Oil Company, Del.Supr., 607 A.2d 1213, 1218 (1992) (quoting Tri–Continental Corp. v.. Battye, Del. Supr., 74 A.2d 71, 72 (1950)).

7. See Cede & Co. v. Technicolor, Inc., Del.Ch., C.A. No. 7129, Allen, C., 1990 WL 161084 (Oct. 19, 1990), Mem. Op. at 19–20, n. 17 (noting that institutional or precedential advantages may en-

Unfortunately, as this case and other cases most decidedly illustrate, one should not put much faith in that expectation, at least when faced with appraisal experts in this Court.[8]

In this case, as is typical, both parties' experts examined the corporation's position at the time of merger, analyzed the corporation's financial statements, sought relevant financial information from management and third parties, and reached demonstrably opposite conclusions. From the testimony presented at trial, it is clear that, at the time of the merger, MPM had enjoyed several remarkable years of business growth and financial success. It is also clear that MPM faced significant challenges in the immediate future if it wished to maintain its then-present position, much less move ahead. Reading petitioner's submissions, one might easily conclude that MPM was poised to become the Microsoft of the SMT industry. By contrast, respondent's submissions give the impression that a more likely comparison, given MPM's myriad management, technical and legal problems, is Apple. In sum, one report is submitted by Dr. Pangloss, and the other by Mr. Scrooge.

Petitioner's expert values MPM at $357.1 million with Gilbert's shares worth approximately $26 million. Respondent's expert concluded that the merger yielded MPM's shareholders a fair value of only $81.7 million, with Gilbert entitled to approximately $5.942 million. Since neither party is entitled to any preference or presumption in this proceeding,[9] the underlying assumptions that drive these valuations must be tested equally to ensure all that relevant facts were properly and reasonably considered. Petitioner is entitled to his *pro rata* share of the fair value of the company.[10] This does not mean he may fairly assume the company overcomes its every challenge and surpasses its every goal. Nor does it allow respondent to demand the Court assume the company's prospects teeter on the brink of doom.

## II. ANALYSIS

Petitioner's expert, Patricof & Co. Capital Corp. ("Patricof"), determined the fair value of petitioner's shares by performing a comparative company analysis and a discounted cash flow (DCF) analysis. Patricof relied equally on these approaches and averaged the results to reach the conclusion that the fair value of MPM's equity is $357.1 million. Respondent's expert, Advest, Inc. ("Advest"), also relied on the comparative company ("guideline company") and DCF models. Its overall approach to determining the fair value of petitioner's shares, however, is quite different. First, Advest determined the "fair market value" of MPM. This was determined by constructing a DCF that represented the transaction from the seller's point of view (the sell-side DCF) and a DCF that represented the transaction from the buyer's point of view (the buy-side DCF).[11] As part of its buy-side analysis, Advest compared its results to what it described as relevant recent

courage acceptance of the whole of one expert's testimony as opposed to the creation of a Court-constructed valuation model).

8. This clear tendency of experts to provide an extreme value most favorable for their client encourages disagreement in every area of the proceeding. Weighing of these numerous minor areas of conflict, and not necessarily the interpretation of financial models, is perhaps the best reason for this Court to consider appointing an independent expert to sort through the clutter submitted.

9. *Pinson v. Campbell–Taggart, Inc.,* Del.Ch., C.A. No. 7499, at 17, Jacobs, V.C., 1989 WL 17438 (Feb. 28, 1989).

10. *In the Matter of the Appraisal of Shell Oil Co.,* Del.Supr., 607 A.2d 1213, 1218 (1992).

11. It is not clear why Advest took the time to construct a buy-side analysis as its report recognizes that under our law, petitioner is entitled to his *pro rata* share of the corporation valued as a going concern without consideration of "any element of value arising from the accomplishment or expectation of merger" (RX118 *MPM Corporation Opinion of Fair Value as of May 2, 1995* [hereinafter Advest Report] at 57), apparently referring to 8 *Del. C.* § 262(h), and its report describes only the sell-side DCF as representing the stand-alone value of MPM without synergies produced by the merger. (Advest Report at 46). Advest described its approach to this valuation as identical to its approach for all valuations, whether it had been retained by the buyer or the seller. This may explain why much of its extensive report, although perhaps beneficial to clients, is irrelevant for the narrow purpose of a Delaware appraisal.

offers for MPM extended by third parties unrelated to this action. Advest also determined MPM's fair market value by comparing MPM's EBITDA, EBIT and P/E ratios to those ratios of its comparable companies. Advest concluded 1) that the comparable public company approach did not provide an accurate valuation of MPM because MPM "was not in a position to go public," 2) that "the value of MPM on a stand-alone basis was $90.5 million for the Equity Value, and $82.5 million after the 8.8% dilution for the stock promised to the non-stockholder management"—the amount resulting from the sell-side DCF analysis and the amount also described as the "fair market value" of MPM, and 3) that the "fair market value" represented by the sell-side DCF calculation might still include some synergies from the merger and is thus the highest value that should be considered to be the "fair value" under Delaware law.

## A. The Appropriate Valuation Method

■ I conclude that the only appropriate way to determine the fair value of petitioner's shares is to compare petitioner's DCF with respondent's sell-side DCF. As described above, Advest's buy-side analysis was constructed in a such a way as to produce a figure representing the value of MPM to Cookson. If Advest had been hired by Cookson to analyze the transaction, this analysis would assist Cookson in its determination of an appropriate offering price. The analysis thus includes consideration of the price at which purchase of MPM would dilute, rather than support, Cookson's earnings and concludes with determination of the "maximum prices at which 100% of the value of the synergies brought to the transaction by the buyer are given to the seller and at which no value is created for the buyer."[12] Our law

neither contemplates nor allows this valuation method, and I give it no further consideration. Nor do I consider Advest's proffer of previous offers to invest in MPM. These figures represent nothing more than offers to purchase, which were surely based on the value of MPM to a particular entity.

I find the comparable company (or guideline company) analyses relatively weak compared with the experts' DCF valuations. As explained below, I find that petitioner's selection of companies fails to provide a comparable data set. And, since Advest concludes that its own guideline company analysis (which itself is not free of concern)[13] does not provide as much of an appropriate measure of MPM's value as its sell-side DCF, I conclude that by far the best way to proceed is to compare and contrast petitioner's DCF with respondent's sell-side DCF.

## B. Similarities in Both DCF Approaches

A discounted cash flow approach requires the creation of a financial forecast that projects the corporation's future revenues and expenses, typically for the next five years. The cash flows used by the experts in this proceeding were similar in structure and both were based on a financial forecast prepared by MPM management in April 1995 (the "April forecast"). This forecast was the last forecast prepared by management prior to the merger date. It includes estimates of MPM's revenues and expenses for fiscal years 1996 through 1998. It is, however, less detailed than previous forecasts and, naturally, reflects changes in MPM's financial position since the production of the last detailed forecast approximately six months earlier. As a result, both experts seek to modify further the April forecast to reflect what they believe to be the "correct" view of

**12.** Advest Report at 45.

**13.** I note, for example, that Advest's guideline company analysis claims that public companies trade on multiples of their P/E ratio and that valuations of mergers and acquisitions transactions are based on multiples of the total enterprise value. Even if true, however, Advest fails to explain why the latter, if either, is more appropriate for use in an appraisal valuation under 8 *Del. C.* § 262, which specifically excludes any

benefits arising from a merger or acquisition. Moreover, I am troubled by Advest's conclusion that there is no need for a premium to be applied to the multiple to reflect MPM's superior performance relative to the comparable companies especially in light of the fact that Advest does apply a premium to the same multiples when determining MPM's terminal value in its sell-side DCF at a time when (five years later) MPM's performance has, if anything, improved.

MPM's future. Petitioner asserts that the April forecast was prepared in anticipation of the merger and implies that the upcoming merger provided some reason for management deliberately to cut anticipated revenue growth and to increase R & D expenses. In support of this position, petitioner notes that the April forecast projections reveal that expected revenue growth was revised downward and expected R & D expenses revised upward from the October forecast. Respondent basically accepts the April forecast.

■ I conclude that management was in the best position to forecast MPM's future before the merger, and finding no evidence that the April forecast included benefits to be obtained via the merger or that the April forecast represented a deliberate attempt to falsify MPM's projected revenues and expenses, I accept management's projections with minor changes to reflect MPM's *actual* financial results and other financial information obtained after the preparation of the projections, but before the merger.

Since the April forecast extended out only three years, each expert needed to establish appropriate assumptions for MPM's growth and expenses for the remaining two years of the five-year discounted cash flow. These assumptions naturally rest upon each expert's preferred view of MPM's future opportunities. For example, petitioner envisions that revenues will grow at 23.5% for the last two years while respondent concludes that revenues will grow at only 10%.

Both parties calculated terminal value by applying multiples of comparable companies. Because I find that respondent's companies are more appropriate comparables and respondent's method is more convincingly supported, petitioner's calculation is disregarded.

The determination of the appropriate discount rate is an area fraught with differences. The parties disagree over the proper method of determining the discount rate, MPM's debt/equity ratio (10% v. 5%), and MPM's cost of debt (9.5% v. 10.5%). In sum,

it appears as if the parties made no attempt to reach agreement on any issues, even those having a minor, if not practically imperceptible effect on the final outcome. The experts, not the Court, are in the best position to resolve these minor differences. When they are unable to do so, this Court will. But the burden of persuading the Court of the reasonableness of their positions remains with the parties. Because I find that petitioner has presented a more thorough and convincing approach to the determination of the discount rate, I accept petitioner's overall method with adjustments only to reflect petitioner's inappropriate selection of comparable companies.

1. Financial forecast: revenue growth

To obtain the most accurate cash flow forecast, it is necessary to start the forecast with accurate, up-to-date financial data. This petitioner's expert did not do. While the April report on which Patricof relied contained the most recent revenue *projections* prepared by management prior to the merger, it was clear that by the time of the merger MPM would have great difficulty meeting the April forecast 1995 sales projection of $108 million. At the end of March, just prior to the preparation of the April forecast, MPM's sales had reached $62.6 million.[14] Thus, the April forecast projected that MPM would generate $45.4 million in revenue, or 42% of the year's revenue, in the remaining three months of the fiscal year. In the absence of evidence to the contrary, I must assume that the April projection represented management's best guess at the time the April forecast was prepared. However, because as of April 30, MPM's fiscal year sales had only reached $72.6 million, or were over $35 million short of the $108 million projection with only two months remaining in the fiscal year,[15] I find that MPM had a remote chance, at best, of meeting the April projection. Therefore, I conclude that the cash flow forecast shall be based on the assumption that MPM's 1995 revenues were $72.6 million increased to re-

---

**14.** RX5 at M00000512 (MPM's Consolidated Statement of Operations Ten Months Ended Mar. 30, 1995).

**15.** RX4 at M00000505 (MPM's Consolidated Statement of Operations Ten Months Ended Apr. 30, 1995).

flect May and June 1995 sales assuming that the sales in May and June 1995 equaled the same percentage of total fiscal year sales as the sales in May and June of the previous year.[16]

■ The next step in the cash flow forecast is to determine if there are necessary revenue *growth* adjustments to the April forecast. The April forecast projected revenue growth of 38.9%, 20%, and 22.2% for 1996 through 1998. Respondent's expert urges me to reduce the growth rates to 33.89%, 15%, and 10%. Petitioner urges growth rates of 66%, 23.5%, and 23.5%.[17] Each side points to numerous factors in support of its proposed changes. For example, in just one area of dispute, petitioner notes that MPM had developed a new printer, the Ultraprint 3000 series, which was described by industry surveys (and even respondent) as a top-of-the-line printer, featuring significant improvements in automation and processing speed. Management expected the Ultraprint 3000 series to increase MPM's domestic and international market share. Respondent notes that although the series was introduced at a trade show in February 1995 and although MPM had approximately 55 orders scheduled for shipment before the end of the fiscal year, at the time of the merger, the series still had design and software problems, and six or fewer machines had actually been produced. Respondent further notes that the initial shipments of the Ultraprint 2000, another printer introduced at the February trade show, revealed a design flaw, which led MPM to offer replacement printers, or loaners, to its customers pending the resolution of the problem. Other disputes involved issues such as the growth rate of the industry—both domestically and internationally— and the degree to which a model produced by one of MPM's main competitors would compete with the Ultraprint 3000 series. The arguments presented by both sides appear to have merit with one exception: I decline to consider the validity of the 1997 and 1998 growth rates selected by petitioner's expert as his report admits the rates were selected to ensure that petitioner received the full amount of the earn-out payments.[18] Petitioner argues that it is only reasonable to assume that MPM, as the seller, would not have agreed to sell MPM if it did not expect to receive the full amount of the earn-out payments. If this is reasonable, I fail to see why it would not also be reasonable to assume that Cookson, as the buyer, would not have agreed to purchase MPM if it expected that it would have to pay the full amount. Yet, obviously, both parties cannot be correct. This ability of both parties to view the same transaction and conclude that they stand in a winning position is one of the main advantages of an earn-out. The seller, convinced of the value of what he is selling, feels sure to receive the full amount of additional contingent payments. The buyer, less sure of the value, but willing to pay for value that is not yet apparent, agrees to a structure that requires him (or allows him) to pay now for value he perceives now and pay later for additional value, but only if that additional value materializes. Both parties bear the risk of their own error in judgment. Basing growth rates on the expectation of the receipt of the full earn-out payments is nothing more than basing growth on a wish. If the parties were forced to close the transaction with one lump-sum payment, the value would be somewhere between the up-front payment and the sum of the up-front payment and the earn-out. Such a value would provide immediate payment, but would reduce the seller's potential upside in exchange for reducing the buyer's potential downside. Even if it were possible to determine the amount of a payment to which these two parties would have agreed, that payment and that transaction

---

**16.** I believe this approach mirrors the approach described by respondent in its answering brief at 15, n. 13. If respondent's calculations in the answering brief are correct and are based on the $72.6 million figure from the April 30 consolidated statements (matters which I leave to the parties to confirm as respondent's expert, apparently applying a similar approach reached a different value), fiscal year 1995 projected sales will be $97.5 million. Compare Ans. Br. at 15, n. 3 ($97.5 million) with Advest Report at 28 ($96.2 million).

**17.** All these increases are measured from the April forecast 1995 revenue projection of $108 million.

**18.** *See* Patricof Report at 19.

would not necessarily represent the ongoing value of MPM, a *pro rata* share to which petitioner is entitled. As petitioner's expert's decision to base the projected growth of revenue is based upon assumptions that do not reflect the goals of an appraisal proceeding, petitioner's suggested growth rates for 1997 and 1998 will not be considered.

■ Remaining still is the question whether and if so, how, adjustments should be made to the April forecast's projection of revenue growth. None of the factors cited by either side appear to be factors that were not known and able to be considered by MPM at the time it prepared the April forecast. Accordingly, even if I were to determine that the arguments on one side appear to be stronger than those on the other, I fail to find any way in which I could conclude that the same conclusion had not been reached by, and that the implications of that decision had not been reflected by, management in its preparation of the April forecast. Therefore, I decline to adjust the revenue growth figures as projected in the April forecast.

■ The final issue relating to the revenue forecast is the determination of appropriate growth rates for 1999 and 2000, the last two years of the experts' cash flow forecasts and two years beyond the time covered by the April forecast. Both experts, apparently having no reason to justify departing from their previous assumptions, continued growth in 1999 and 2000 at the same level as 1998. I adopt their method and continue growth at the same rate (22.2%) as projected in the April forecast.

2. Financial forecast: expenses

■ The April forecast projected 1995 R & D expenses at 10% of sales and 1996–1998 R & D expenses at 14% of sales. For the same reasons as discussed above, I find no

reason to believe that management's estimate, including that for 1995,[19] was anything other than the best estimate available. Accordingly, the experts shall adopt the R & D expenses, as well as other expenses identified in the April report, at the percentage rates established in that report.

3. Terminal value

With the above guidance, the experts should be able to construct a single cash flow projection for MPM through the year 2000. At this point they will need to determine MPM's terminal value—the value representative of MPM at the end of fiscal year 2000. In their computations of terminal value, both experts compiled a list of companies comparable to MPM. The value of each company's equity was then expressed as a multiple of either its net income or earnings before interest, taxes, depreciation, and amortization ("EBITDA"). The experts then applied the median of the comparable multiples to MPM's net income or EBITDA to predict the value of MPM's equity.

■ Petitioner's comparable companies consisted of seven companies "whose business is manufacturing and marketing electronic production equipment."[20] Respondent contends that petitioner's comparables are not, in fact, comparable because five of the seven are engaged in the manufacture of equipment used in the production of integrated circuits and semiconductors, and only two manufacture screen printers like MPM. It is petitioner's burden to demonstrate the reasonableness of the comparables selected by its expert in the performance of his analysis.[21] I do not believe that manufacturers of semiconductor production equipment are reasonably comparable to MPM's business. As petitioner's expert candidly testified at trial: "There is such an enormous breadth of difference between manufacturing facilities."[22] The difference between the specifications and

---

**19.** 1995 R & D expenses could be forecast using the same method as described above for sales. However, since unlike sales, R & D expenses are within management's control, and because, as of the end of April, R & D expenses exceeded estimates by 7.8% (RX4 at M00000505) I believe the better course is to adopt management's estimates.

**20.** Patricof Report at 23.

**21.** *See Pinson v. Campbell–Taggart, Inc., supra.*

**22.** Trial Tr. at 195.

technical requirements needed to produce microprocessors like the "Pentium" chip, and those required to squeeze solder on to a soon-to-be circuit board strikes me as very different. As such, the companies that manufacture the machinery used to produce them will also be very different. While it may well be true that each "fall[s] into the electronics assembly market,"[23] such a broad definition sweeps in too much.

The Patricof report excluded producers of printed circuit boards and manufacturers of placement equipment used along the same assembly line as MPM's screen printers. Placement machines existing along the same circuit board production path ought to be even more directly comparable than the manufacturers of semiconductor production equipment. Yet, Patricof excluded them because "this area is characterized by higher competition and lower profitability than the sector in which MPM operates."[24] Stiff competition and the necessity of a technological edge (achieved through research and development expenditures) are precisely the characteristics identified as characteristics of the SMT industry in two industry research reports relied upon by the parties. The same argument for exclusion could, and indeed ought to, be made regarding the asset base of the semiconductor comparables. Of these five, all but one had assets substantially in excess of MPM.[25] As a result, the median asset value of Patricof's comparables was nearly three times that of MPM.[26] This unreasonably skewed the results of this analysis. For these reasons alone, I find Patricof's comparative company analysis insufficiently reliable and consider it no further.[27]

Advest's list of selected comparables consists of only three companies, all of which are significantly less successful than MPM by every financial measure provided.[28] Two of the three (the two with the best perfor-

mance) were also included in Patricof's comparables. All three companies manufacture equipment for the SMT industry. Although Advest's selection of comparable companies is low in number, it has convincingly demonstrated the appropriateness of the selection, especially in comparison to Patricof's selection, which included non-SMT industry companies.

Rather than employ a multiple of net income (Patricof's selected multiple), Advest based its calculation of MPM's terminal value on a multiple of EBITDA. According to respondent, use of EBITDA, rather than net income, more accurately reflects MPM's equity value by removing any distortions caused by MPM's increased capital expenditures and increased depreciation over the time horizon of the cash flows. Both net income and EBITDA are acceptable multiples with which to determine terminal value, but petitioner has provided no explanation of why, in this case, net income, rather than EBITDA, should be used. Accordingly, I accept respondent's use of EBITDA to determine MPM's terminal value.

Apparently noting that MPM's performance was superior to that of the comparable companies, respondent added 12% premium to the multiple resulting in an EBITDA multiple of 7.5. Petitioner also added a premium (10%) to its multiple (apparently for similar reasons), and I accept Advest's premium as a reasonable way to account for MPM's superior performance.

4. Discount rate

Advest's suggested discount rate is based, in part, on a survey of venture capitalist firms, all of which indicated they required returns of up to 50% for similar investments in companies like MPM. From the survey,

23. Petitioner's Open. Br. at 27.

24. Patricof Report at 23.

25. *See* Patricof Report Ex. B (total assets of the five, in ascending order, were $67.8, $113.7, $134.0, $143.2, and $289.6 million, compared to MPM with assets of $41.3 million).

26. *Id.*

27. I am not persuaded by the fact that an investment bank hired by MPM to evaluate the possibility of a public offering also employed six of the seven Patricof "comparables." Its lengthy list also included two of respondent's three comparables.

28. Advest Report, Ex. J.

Advest derived a range of MPM's cost of equity (blended to reflect both common and preferred stock) of 35% to 45%. Advest concluded that the higher figure was more appropriate because MPM's projections were too aggressive and because, although no particular reason was offered, the higher figure of 45% was warranted by MPM's "risk profile."[29] MPM's weighted average cost of capital ("WACC") was thus calculated at 41.1% (using 45% cost of equity) and 32.1% (using 35%). To support its suggested cost of capital, Patricof employed the capital asset pricing model ("CAPM") to calculate a 20.6% cost of equity and a 19.9% WACC.[30]

 Respondent argues that CAPM is used primarily for companies with publicly traded shares and is not appropriate for use in this instance. Yet respondent does not object to the use of other data from its comparable companies in its DCF, just the use of data required for the CAPM. I find no convincing explanation of why respondent's survey provides a more accurate estimate of MPM's cost of capital than petitioner's CAPM approach. If anything, respondent's survey comes dangerously close to providing an estimate of the cost of equity for an acquiring company—a practice that is not acceptable when valuing a company as a stand-alone entity under our appraisal statute.[31] I conclude that Patricof has sufficiently supported its use of the CAPM but not each assumption it has employed in the model. Therefore, I accept Patricof's overall approach to the determination of MPM's discount rate except to the extent it is based on information obtained from Patricof's selection of comparable companies. Accordingly, MPM's discount rate shall be that rate determined through use of Patricof's CAPM model except that the comparable beta employed shall be based on the *average beta of respondent's comparable companies*.

29. *Id.* at 47.

30. Patricof Report at 27 (determining WACC of 19.9%). The capital asset pricing model is a commonly used method that seeks to determine a subject company's cost of equity by determining the hypothetical risk premium that the market would demand to make the investment. *See Cede*

### 5. Adjustments to MPM's equity value

 Petitioner objects to several of respondent's proposed adjustments to MPM's equity value. First, respondent contends that MPM's equity value must be discounted by 8.8% to reflect the cost of MPM's obligations to non-shareholder management. Allegedly these obligations represent the financial expense of satisfying MPM's promise to provide equity to non-shareholder management. Respondent claims that these obligations are similar to the obligation that petitioner previously claimed to be owed by MPM—the alleged obligation for which petitioner received MPM's equity in settlement. Respondent, however, has failed to provide any evidence of MPM's actual obligation or any evidence of threatened litigation concerning such an obligation. Accordingly, I find no basis to discount MPM's equity by 8.8%.

 Petitioner also objects to respondent's inclusion of transaction costs, which represent the costs of the merger and which were assessed against any payment received by MPM's shareholders. Respondent has failed to explain why these costs, unique to the merger transaction, should be reflected in an appraisal valuation that focuses on the value of the company as a going concern. Accordingly, I decline to consider these costs as well.

### C. Post–Merger Interest

Petitioner asserts that this Court should award interest at the rate that would have been obtained by a prudent investor during the pendency of this proceeding. According to petitioner's calculations, that rate, based on a mixture of long and short-term investments, yields an annualized rate of 19.2%.[32] Petitioner also seeks an award of compound interest as "every investor calculates return based on compound interest."[33]

& Co., *supra* at 68–69 for a thorough explanation of the theory.

31. *See Cede & Co., supra* at 74.

32. *See* PX115 (Petitioner's Representative Model of a Prudent Investor).

33. Petitioner's Post–Trial Reply Br. at 24.

Respondent, relying on *Charlip v. Lear Siegler, Inc.,*[34] contends that petitioner's reliance on the prudent investor rate, to the exclusion of all other factors, is improper. Moreover, to the extent that respondent supports this Court's consideration of a prudent investor rate, it disputes not the investments, but the weighting of those investments proposed by petitioner. Respondent's proposed interest rate consists of equal weighting of three factors: 1) MPM's cost of borrowing (calculated by respondent as 6.5%), 2) the legal rate of interest, and 3) the prudent investor rate, calculated according to the weighting adopted by this Court in *Chang's Holding's, S.A. v. Universal Chemicals & Coatings Inc.*[35]

An award of interest may be said to support two goals.[36] First, the award compensates petitioner for the loss of the use of the fair value of his shares during the pendency of the proceeding. Second, the award forces the corporation to disgorge any benefits it obtained from the use of the fair value of petitioner's shares during the pendency of the proceeding. Petitioner's suggested interest rate fails to reflect both of these goals. Moreover, the prudent investor rate is not necessarily the only rate that would provide "perfect" compensation to petitioner.[37]

Respondent's suggested rate more closely reflects the twin goals of an award of interest, although the legal rate of interest is typically used only when the parties have failed to provide an adequate record. I therefore adopt respondent's suggested approach modified to exclude consideration of the legal rate. Accordingly, I award petitioner interest on the fair value of his shares from the date of merger to the date of payment at a rate resulting from equal weighting of MPM's cost of debt and the prudent investor rate, as those rates are presented by respondent.

## D. Respondent's Motion to Compel Petitioner to Request Replacement Certificates

The parties have burdened the Court with a still unresolved issue concerning Petitioner's standing to pursue an action pursuant to 8 *Del. C.* § 262.

8 *Del. C.* § 262(i) provides that the Court shall direct the corporation to make payment to petitioners of the fair value of their shares. When the appraised shares are represented by certificates, payment shall be made "upon the surrender to the corporation of the certificates representing such stock." [38] Respondent's original answer to Gilbert's petition for appraisal conceded ownership by stating that "immediately prior to the effective time of the merger ... Petitioner owned 800 shares of the capital stock of M.P.M." Respondent has filed a motion to amend that answer so that it reads "immediately prior to the effective time of the merger ... Petitioner was the shareholder of record of 800 shares." Petitioner has not responded to that motion to amend; I have neither signed nor denied the motion.

Respondent now contends that Gilbert does not possess the certificates representing his 800 shares of MPM's common and preferred stock. As a result, respondent filed a motion seeking to require Gilbert to request replacement certificates or, in the alternative, to dismiss this appraisal action for failure to comply with 8 *Del. C.* § 262(i). Respondent also notes that, pursuant to 8 *Del. C.* § 262(g), this Court may require petition-

---

34. Del.Ch., C.A. No. 5178, at 4, Walsh, V.C., 1985 WL 11565 (July 2, 1985) ("the prudent investor approach is no longer the sole means by which to determine a fair interest rate").

35. Del.Ch., C.A. No. 10856, at 8–9, Chandler, V.C., 1994 WL 681091 (Nov. 22, 1994).

36. *Grimes v. Vitalink Communications Corporation*, Del.Ch., C.A. No. 12334, at 25–6, Chandler, C., 1997 WL 538676 (Aug. 26, 1997).

37. *See, e.g,. Grimes, supra* at 28–29 (noting that "petitioners' election to exercise their statutory right to reject the merger amount and to pursue appraisal does not shift to the corporation all responsibility for losses they may incur as a result of their inability to use the funds retained by the corporation. Petitioners could have mitigated their losses and obtained perfect compensation for the loss of the use of their funds by borrowing the fair value of their shares.").

38. 8 *Del. C.* § 262(i).

er to submit his certificates to the Register in Chancery for the duration of the appraisal proceeding.

Petitioner notes that the shares were not publicly traded and alleges that all his shares contained transfer restrictions, as outlined in MPM's certificate of incorporation, that provide MPM the right of first refusal. His counsel has also apparently represented that Gilbert will seek replacement of the certificates before seeking payment. This is, of course, what the statute would require. In order to move this action to a meaningful conclusion:

1) The motion to amend is *granted.* Respondent will be permitted to change its statement and acknowledge no more than the fact that Gilbert was the shareholder of record of 800 shares immediately before the merger. I do not dispute that Gilbert is not entitled to payment until he presents his certificates, but whether he will be able to do so and whether he will insist on payment without presentation of the certificates are events with outcomes yet to be determined. Any request for a decision based on those events is premature.

2) Having granted the motion to amend, the next question becomes whether Gilbert was entitled to an appraisal proceeding at all. Gilbert has the burden of demonstrating ownership of the shares. But it also seems logical that if ownership remained in question, respondent would have filed a pleading or claimed in argument that Gilbert has failed to show ownership. Certainly if he could not show ownership, Gilbert would not be entitled to appraisal. Respondent seeks as an alternative to compel a request to replace the certificates; a request that, in my opinion, is premature. I suspect that Gilbert will attempt to present documents that establish his ownership and that, with those documents, the burden would shift to respondent to rebut any presumption of ownership created by those documents. Respondent alleges that Gilbert may have completed an illegal transfer (and thus may not be the owner) but that issue is not before the Court.

In sum, I question whether respondent raises the ownership issue simply to force Gilbert to go through the process of requesting certificates because that process will be burdensome to Gilbert and may be hindered by a pledge he has placed on the shares. So, even having granted the motion to amend, I find no current viable challenge to this action forced simply by respondent not acknowledging that petitioner owns the shares while at the same time not stating that petitioner does not own the shares in a way that creates a valid challenge to proceeding on the appraisal issue.

I, of course, await with great anticipation the next tactical move by the parties on this issue.

### III. CONCLUSION

The parties shall confer and submit an appropriate form of order consistent with the substantive findings above.