M.P.M. ENTERPRISES, INC.,
Respondent Below,
Appellant,

v.

Jeffrey D. GILBERT, Petitioner
Below, Appellee.

No. 266, 1998.

Supreme Court of Delaware.

Submitted: March 15, 1999.
Decided: June 25, 1999.

Jon E. Abramczyk, and Christopher F. Carlton, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Richard J. McCarthy, *pro hac vice* (argued) of Edwards & Angell, Boston, Massachusetts, for Appellant.

Allen M. Terrell, Jr., (argued), and Srinivas M. Raju, of Richards, Layton & Finger, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH and HARTNETT, Justices.

VEASEY, Chief Justice.

In this appeal of a statutory appraisal action under 8 *Del.C.* § 262, we consider whether the Court of Chancery committed legal error or, alternatively, abused its discretion by applying an appraisal analysis that accorded no weight to the terms of the merger giving rise to the appraisal action or to the terms of two prior offers for equity stakes in the subject corporation. We further consider whether the Court of Chancery erred in refusing to consider the dilutive effect of alleged obligations incurred by the company to nonstockholder employees. We affirm the judgment of the Court of Chancery on the ground that under well-established precedent of this Court, the Court of Chancery did not commit legal error or abuse its discretion in its choice and application of appraisal methods.

### *Facts*

Petitioner below-appellee, Jeffrey D. Gilbert instituted a statutory appraisal action as the sole dissenting stockholder of respondent below-appellant, M.P.M. Enterprises, Inc. ("MPM"), following MPM's merger into a subsidiary of Cookson Group, PLC ("Cookson") a London-based industrial concern, on May 2, 1995.

Prior to the merger, MPM was a Delaware corporation, headquartered in Franklin, Massachusetts. It was engaged in the design, manufacture and distribution of screen printers.[1] Business was very good in the 1980s and early 1990s. In fact, according to MPM's consolidated financial statements, in fiscal years 1991–94, MPM's sales increased from $13.5 million to $55.5 million and MPM's net income increased from $8,300 to $6.5 million. In March 1995, MPM and Cookson signed an Agreement of Merger that provided for immediate payments by Cookson of $65 million upon consummation of the merger, with

1. Screen printers are one form of machine used in the surface mount technology industry to attach electronic components to circuit boards. Screen printers use a squeegee to push solder paste through a stencil onto specific points on circuit boards where components need to be attached.

contingent earn-out payments up to an additional $73.635 million.[2] On May 2, 1995, the parties consummated the merger.

Gilbert owned 600 shares of MPM's common stock and 200 shares of MPM's preferred stock, giving him an ownership stake in MPM of 7.273% on a fully diluted basis. Under the terms of the merger, Gilbert would have received $4.56 million (minus transactional costs) and the opportunity to receive contingent payments of up to an additional $5.36 million if MPM reached the earn-out goals set forth in the Merger Agreement. Apparently believing that these sums did not reflect MPM's going concern value at the date of the merger, Gilbert chose to exercise his statutory appraisal right, pursuant to 8 *Del.C.* § 262(a), and filed an action in the Court of Chancery.

In the appraisal action, MPM presented expert testimony concerning MPM's going concern value at the date of the merger from William A. Lundquist and Advest, Inc. (collectively "Lundquist"). In response, Gilbert presented expert testimony from Kenneth W. McGraw and Patricof & Co. (collectively "McGraw"). As is often the case in such actions before the Court of Chancery, these experts came up with widely divergent appraisal values. Lundquist, focusing on a supposedly gloomy outlook for MPM and its industry, placed MPM's going concern value at $81.7 million. In contrast, McGraw focused on a particularly rosy outlook for MPM and its industry, placing MPM's going concern value at $357.1 million.

Lundquist arrived at his appraisal value through two separate discounted cash flow ("DCF") analyses along with a comparable public companies analysis. He constructed both a "sell-side" DCF (representing the transaction from MPM's point of view) and a "buy-side" DCF (representing the transaction from a buyer's point of view). The buy-side analysis, representing the price at which all of the synergies from the transaction go to the seller, resulted in the highest price a reasonable buyer would pay for MPM. As part of his analysis, Lundquist compared the values derived from the buy-side analysis to the terms of the merger, as well as two earlier offers for equity interests in MPM from Dover Technologies [3] and TA Associates, Inc.[4] (the "prior offers"). In his comparable public companies analysis, Lundquist compared MPM's EBITDA, EBIT and P/E ratios to those of comparable public companies to determine a fair market value for MPM.

After examining the data, Lundquist concluded that the comparable public companies approach was problematic because MPM was not in a position to go public, rendering comparison unhelpful. He also concluded, based on the sell-side DCF, that MPM's equity value at the time of the merger was $90.5 million. He then discounted this amount by 8.8% (the amount of alleged obligations to non-stockholder employees) and again by 1% (the transaction costs borne by approving stockholders) to arrive at a fair market value for MPM at the date of the merger of $81.7

---

**2.** The contingent earn-out depended on MPM's average annual earnings between June 1, 1995 and June 30, 1998. If the average annual earnings met or exceeded $35 million, the entire contingent payout became due. If the average annual earnings fell between $14 million and $35 million, some contingent payout less than the maximum became due. If the average annual earnings fell below $14 million, no contingent payout became due.

**3.** Dover is the parent company of one of MPM's principal competitors. In 1994, following due diligence, Dover offered to pay $50 million and assume certain MPM liabilities for all of the equity in MPM. MPM claims that it did not accept this offer because of antitrust concerns, not because of any insufficiency in the offer.

**4.** TA is a venture capital group that, in October 1994, offered to invest $10–$20 million in MPM based on an assumed equity value for MPM of between $50–$65 million.

million.[5] Assuming that this last figure included some synergies from the merger (disallowed by § 262),[6] Lundquist pegged it as the highest possible going concern value for MPM at the date of the merger.

McGraw performed two analyses: a DCF analysis and a comparative public companies analysis. McGraw took the values from each of these approaches, weighted them equally, and arrived at a fair market value for MPM's equity at the date of the merger of $357.1 million.[7]

In evaluating the various approaches, the Court of Chancery settled on a DCF analysis as the best method for discerning MPM's going concern value at the date of the merger.[8] It first noted that it could not consider Lundquist's buy-side DCF analysis because this method approached the value from the buyer's perspective, rather than valuing the company as a going concern, as required by § 262.[9] In addition, the Court of Chancery stated that it would not use Lundquist's proffer of previous offers to invest in MPM because "[t]hese figures represent nothing more than offers to purchase, which were surely based on the value of MPM to a particular entity."[10] Finally, the Court discarded the opposing comparative public company analyses as being relatively weak in comparison to the DCF analyses.[11] Finding that the DCF analysis conducted by McGraw, Gilbert's expert, was the more "thorough and convincing approach to the determination of the discount rate," the

Court accepted Gilbert's framework as a starting point.[12]

The first step in the Court of Chancery's manipulation of this framework was to determine revenue growth projections. The Court found that, although MPM management had predicted 1995 sales of $108 million in April 1995, it was apparent by the date of the merger that MPM would have a very difficult time meeting this projection.[13] Therefore, the Court based the cash flow forecast on the assumption that MPM's 1995 revenues would be lower than the April projection.[14]

Also included in the April management projection were projected revenue growth rates of 38.9% for 1996, 20% for 1997 and 22.2% for 1998. At the date of the merger, MPM had recently developed a new product. Gilbert argued that, at the date of the merger, this product was expected to revolutionize the screen printing industry and, therefore, the Court of Chancery should adjust the growth rates upward. MPM, on the other hand, noted that this new product was experiencing serious development problems at the date of the merger and, therefore, the trial court should adjust the growth rates downward. The Court rejected both attempts to adjust the growth rates, finding no way to conclude that the April 1995 projection had not incorporated both of these claims.[15] For the same reason, it refused to adjust

5. The Court of Chancery ignored the 1% reduction for transaction costs and used $82.5 million as the fair value arrived at by Lundquist.

6. As explicated later in this Opinion, section 262(h) directs the Court of Chancery to "appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation...."

7. McGraw found a value of $347.5 million using the comparative public company approach and $366 million using the DCF approach.

8. *Gilbert v. MPM Enterprises, Inc.*, Del.Ch., 709 A.2d 663, 668 (1997).

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.* at 669.

13. *Id.*

14. *Id.* at 669–70.

15. *Id.* at 671.

the April 1995 projection for research and development expenses.[16]

Assuming a five year DCF projection, the next step was to determine the terminal value of MPM at the end of fiscal year 2000.[17] Both experts used comparable public companies to make this determination. Finding that Lundquist, MPM's expert, had "convincingly demonstrated the appropriateness of [his] selection [of comparable companies]" the Court of Chancery used the terminal value multiple of 7.5 provided by MPM.[18]

The Court of Chancery next moved to the determination of the proper discount rate. It approved of McGraw's methods, but disapproved of the comparable companies McGraw used in applying these methods.[19] It solved this problem by holding that "MPM's discount rate shall be that rate determined through use of [McGraw's] CAPM model except that the comparable beta employed shall be based on the *average beta of [MPM's] comparable companies*." [20]

As a final matter, the Court of Chancery considered MPM's claim that Gibson's ownership percentage in MPM should be diluted by 8.8%, or the amount of obligations it claimed to have outstanding to non-stockholder employees. It found that MPM had failed to provide any evidence that these obligations existed, or that litigation had been threatened over them.[21] Accordingly, the Court refused to allow a dilution of Gibson's ownership percentage based on these alleged obligations.[22]

The opinion of the Court of Chancery left some issues unanswered, as it never provided the actual discount rate that the parties should apply. On April 24, 1998, the Court issued a second opinion, in which it determined several components of the discount rate: the cost of debt (9.6%); the debt to total capital ratio (5%); the source of "raw" beta data (Bloomberg); and a small company premium (2.87%).[23] On May 22, 1998, the Court issued a final order and judgment, in which it determined that MPM's equity value at the date of the merger was $156,331,000.[24] On a per share basis, this translated into a value of $14,211.91, or a total of $11,369,528 for Gilbert's 800 shares.[25]

MPM appealed to this Court, challenging the decision of the Court of Chancery on two grounds. First, MPM claimed that the Court erred in failing to consider the terms of the merger or the terms of the prior offers in its determination of fair value. Second, MPM challenged the Court's conclusion that there was no evidence of record to support the dilution of Gilbert's ownership share due to obligations owed to non-stockholder employees.

From the language in the opinions of the Court of Chancery, we were unable to discern why the Court did not use the values derived from the merger and the prior offers in its determination of fair value. We could not determine whether it accorded these values no weight after admitting them into evidence, or whether it refused to admit them into evidence as inconsistent with legally acceptable meth-

16. *Id.* This projection had research and development expenses at 10% of sales for 1995 and 14% of sales for 1996–1998.

17. *Id.*

18. *Id.* at 672.

19. *Id.* at 672–73.

20. *Id.* at 673 (emphasis in original).

21. *Id.*

22. *Id.*

23. *Gilbert v. M.P.M. Enterprises, Inc.,* Del.Ch., C.A. No. 14416–NC, 1998 WL 229439 (April 24, 1998) at 11.

24. *Gilbert v. MPM Enterprises, Inc.,* Del.Ch., C.A. No. 14416–NC (May 22, 1998).

25. *Id.* The trial court also added interest of 8.15%, compounded monthly, from May 2, 1995 to the date of payment. The trial court calculated this amount as $3,921.46 per share. *Id.*

ods of valuation under § 262. We remanded this matter to the Court of Chancery for clarification so that it could provide a better explanation of its analysis with respect to both the merger and the prior offers.[26] In the event its determination was factual and not legal, we further asked the Court to recite the facts it relied on in according zero weight to these values.[27]

In its remand opinion, the Court of Chancery clarified its position with respect to the merger and the prior offers.[28] The Court stated that it did not mean to imply that § 262 barred consideration of specific offers for a company, and that it did, in fact, consider the relevance of each of these offers to the fair value of MPM at the date of the merger.[29] It explained that, while potentially relevant, the evidence with respect to both the merger and the prior offers was of only marginal utility and therefore received no weight in the final analysis.[30] The Court further explained that, rather than relying on specific evidence supporting its decision to accord zero weight to these offers, it relied on the absence of any credible evidence provided by MPM that established a nexus between the values derived from the offers at issue and the going concern value of MPM at the date of the merger.[31]

### The Relevance of the Merger and Prior Offers

■ We review the findings of the trial court in a statutory appraisal proceeding with a high level of deference.[32] In such cases, "[t]he discretion to weigh the evidence belongs to the Court of Chancery with our review one of abuse of that discretion." [33] But our review is *de novo* to the extent the trial court decision implicates the statutory construction of § 262.[34]

In this case, the Court of Chancery did not err in its decision regarding the admissibility of the terms of the merger and of the prior offers. It did admit all of these offers into evidence, although it did not dwell on them and ultimately chose not to accord them any weight. Therefore, the inquiry must shift to whether the Court abused its discretion in refusing to give any weight to the terms of the merger and of the prior offers in its appraisal of Gilbert's shares.

Section 262(h) requires the trial court to "appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation." [35] Fair value, as used in § 262(h), is more properly described as the value of the company to the stockholder as a going concern, rather than its value to a third party as an acquisition. We have long recognized that failure to value a company as a going concern may result in an understatement of fair value.[36]

■ In *Weinberger v. UOP*[37] and its progeny,[38] we elucidated the extent of the

**26.** *MPM Enterprises v. Gilbert*, Del.Supr., No. 266, 1998, Walsh, J. (Nov. 23, 1998) (Order).

**27.** *Id.*

**28.** *Gilbert v. M.P.M. Enterprises*, Del.Ch., C.A. No. 16158–NC/ 14416–NC (Feb. 4, 1999).

**29.** *Id.* at 2–4.

**30.** *Id.*

**31.** *Id.* at 5–6.

**32.** *See In re Shell Oil Co.*, Del.Supr., 607 A.2d 1213, 1219 (1992).

**33.** *Id.* at 1221.

**34.** *See M.G. Bancorporation v. Le Beau*, Del. Supr., No. 153, 1998, —— A.2d ——, 1999 WL 293706 (1999), *reh'g den.*, May 27, 1999.

**35.** 8 *Del.C.* § 262(h).

**36.** *See Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Supr., 701 A.2d 357, 362 (1997); *Cede & Co. v. Technicolor*, Del.Supr., 684 A.2d 289, 299 (1996); *Baron v. Pressed Metals of America, Inc.*, Del.Supr., 123 A.2d 848, 854 (1956).

**37.** Del.Supr., 457 A.2d 701 (1983).

discretion of the Court of Chancery in choosing a method of valuation in a statutory appraisal. *Weinberger* acknowledged the Court's discretion to use "any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court, subject to our interpretation of 8 *Del.C.* § 262(h)." [39] Assuming the variables applied by the trial court are proper, a DCF analysis is one such technique or method of determining going concern value that is within the trial court's discretion to use. [40]

■ In this appeal, MPM does not challenge the DCF analysis employed by the Court of Chancery or the specific variables used in the analysis. [41] Instead, MPM focuses on other language in § 262(h) requiring the trial court to "take into account all relevant factors" when determining the fair value of a petitioner's shares. [42] MPM contends that the figures derived from the merger and the prior offers are "relevant factors" that the trial court impermissibly ignored in its determination of fair value. According to MPM, if the trial court had considered these "real world" values, it would have realized that the results of the DCF analysis did not accurately reflect the going concern value of MPM at the date of the merger.

■ The initial determination by the Court of Chancery of the variables the parties should employ in the DCF analysis was a well-reasoned use of discretion. The Court certainly acted as an independent appraiser of MPM, using its judgment to discern which facets of the experts' competing analyses correctly set forth the assumptions necessary for a proper DCF analysis. The only question remaining is whether the Court abused its discretion in refusing to compare the figures derived from this properly-applied DCF analysis to the merger value and the valuations implicit in the prior offers. Values derived in the open market through arms-length negotiations offer better indicia of reliability than the interested party transactions that are often the subject of appraisals under § 262. [43] But the trial court, in its discretion, need not accord any weight to such values when unsupported by evidence that they represent the going concern value of the company at the effective date of the merger or consolidation.

In this case, MPM proffered evidence of the merger and the prior offers only as part of Lundquist's buy-side DCF. The Court of Chancery properly rejected this DCF approach because it focused on the elements of value that would arise from the merger, rather than on the going concern value of MPM without any consideration of such synergistic values. As noted, section 262(h) explicitly states that the trial court "shall appraise the shares, determining their fair value *exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation . . . .*" [44] By determining the highest price at which all synergies devolved to the seller, this buy-side analysis was undoubtedly proscribed by § 262(h).

---

**38.** *See, e.g., Le Beau,* —— A.2d at ——; *Cede & Co.,* 684 A.2d at 297; *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 940 (1985).

**39.** *Id.* at 713.

**40.** *See Id. Compare Le Beau,* —— A.2d at —— (DCF analysis rejected due to the experts' use of improper variables); *Cede & Co.,* 684 A.2d at 299 (same).

**41.** Although MPM objected to some specific variables before the Court of Chancery, it did not raise these issues in its opening brief so we need not consider them.

**42.** 8 *Del.C.* § 262(h).

**43.** *See, e.g., Le Beau,* —— A.2d —— (merger of target into stockholder of 95% of target); *Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796 (1992) (parent-subsidiary merger); *Bell v. Kirby Lumber Corp.,* Del.Supr., 395 A.2d 730 (1978) (parent-subsidiary merger).

**44.** 8 *Del.C.* § 262(h) (emphasis supplied).

Irrespective of that fact, MPM contends that the Court of Chancery still should have considered the terms of the merger and the prior offers in its final appraisal decision. To support this contention, MPM points to *Van de Walle v. Unimation Inc.,*[45] where the Court of Chancery found that such transactions are the most reliable indicia of fair value, even more reliable than expert testimony concerning DCF analyses.[46] But *Van de Walle* differs from this case in a very significant respect. In *Van de Walle,* certain minority stockholders claimed that the target company's board of directors had breached its fiduciary duties in accepting an unfair merger price. In essence, the stockholders argued that the board of directors had failed to obtain the best price available in executing a merger. In this case, a dissenting stockholder petitioned the Court of Chancery to determine the fair value of his shares. Under section 262, the fairness of the price on the open market is not the overriding consideration. Instead section 262(h) requires that the Court of Chancery discern the going concern value of the company irrespective of the synergies involved in a merger. A fair merger price in the context of a breach of fiduciary duty claim will not always be a fair value in the context of determining going concern value.

■ We agree with the general statement made by the Court in *Van de Walle.* A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value. But in an appraisal action, that merger price must be accompanied by evidence tending to show that it represents the going concern value of the company rather than just the value of the company to one specific buyer. In this case, MPM failed to present this additional evidence with respect to either the merger or the prior offers.[47] This led the Court of Chancery to decide that these values were of only marginal relevance, if any. In our view, this determination was not an abuse of discretion.

### *Alleged Obligations to Non–Stockholder Employees*

■ On a claim of error, we review specific factual findings made by the trial court in a section 262 appraisal with a high level of deference.[48] This Court will reverse the findings of the trial court only in cases of clear error and where justice so requires.[49]

■ At trial, MPM provided two forms of evidence to prove that it was obliged to provide equity to non-stockholder management. This consisted of three written employment agreements and the live testimony of Thomas Bagley, MPM's President and Chief Executive Officer.

The three written employment agreements each include a section entitled "Long–Term Incentive." According to this section, the specified employees *"will be* granted an option, *subject to rules, regulations, and restrictions* as determined by the Board of Directors of the Company in their sole discretion to acquire . . . stock in the company."[50] This section goes on to define the specific number of shares that the employee "shall possibly have the

---

45. Del.Ch., C.A. No. 7046, Jacobs, V.C., 1991 WL 36477 (March 6, 1991).

46. The court stated that "[t]he fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair." *Id.* at 38.

47. The prior offers suffered from flaws that made them marginally useful in an appraisal

under section 262, under the best of circumstances. Both were remote in time from the date of the merger and neither was actually consummated.

48. *Kahn v. Household Acquisition Corp.,* Del. Supr., 591 A.2d 166, 175 (1991).

49. *In re Shell Oil,* 607 A.2d at 1219.

50. Employment Agreement, ¶ II (emphasis supplied).

right to acquire...." [51] The Court of Chancery did not have before it a later agreement showing that these contingent obligations actually vested, and in what amount they vested. Also, MPM's financial statements prior to the merger did not contain any indication of these options. The trial court did not err in finding that the employment agreements alone did not provide sufficient proof of the alleged obligations.

 Bagley's testimony could have provided the extra element lacking in the employment agreements. He testified that MPM made oral commitments to the non-stockholder management. When asked how MPM determined that payments would be made to non-stockholders, Bagley answered that "[w]e had in all of these instances with all of these people had discussions with them. In some cases we had written commitments to them to provide them with equity participation in the organization, in MPM." The trial court was not convinced by this testimony and found that MPM had failed to provide sufficient evidence to prove that these payments of equity actually were legal obligations of MPM rather than merely costs of the merger. As we have stated, "[w]hen the determination of facts turns on a question of credibility and the acceptance or rejection of 'live' testimony by the trial judge, [the trial court's] findings will be approved on review." [52]

### Conclusion

The Court of Chancery's appraisal of Gilbert's shares in MPM is affirmed in all respects.

---

51. *Id.* (emphasis supplied) (original in uppercase).

52. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972).