HIGHFIELDS CAPITAL, LTD., Highfields Capital I, L.P., and Highfields Capital II, L.P., Petitioners

v.

AXA FINANCIAL, INC., Respondent.

C.A. No. 804–VCL.

Court of Chancery of Delaware, New Castle County.

Submitted: June 27, 2007.
Decided: Aug. 17, 2007.

Kenneth J. Nachbar, Susan Wood Waesco, John P. DiTomo, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington; R. Todd Cronan, John O. Farley, Matthew J. Thaler, Haima Varadan Marlier, Goodwin Proctor, LLP, Boston, MA, for petitioners.

Bruce L. Silverstein, Martin S. Lessner, Elena C. Norman, Dawn M. Jones, Young, Conaway, Stargatt & Taylor, LLP, Wilmington; Edward J. Velazquez, Axa Equitable Life Insurance Co., New York City, for respondent.

## OPINION

LAMB, Vice Chancellor.

An institutional investor petitions the court, pursuant to 8 *Del. C.* § 262, seeking judicial appraisal of its equity holdings in a large insurance conglomerate as a result of that company's July 2004 all-cash, all-

shares merger. Based on the evidence presented at trial, the court believes that a combined sum-of-the-parts and shared synergies analysis is the most reliable valuation methodology in this litigation. The court exercises its independent business judgment to make several alterations to the calculations utilized in those models by the respondent's expert, and determines that the fair value of the petitioner's stock on the date of the merger was $24.97 per share.

## I.

### A. *The Parties*

At issue in this litigation is the fair market value, as of July 8, 2004, of stock of The MONY Group, Inc., a company acquired on that date by the respondent, AXA Financial, Inc. ("AXA"). A diversified financial services organization, AXA is wholly owned by AXA Group, a French holding company for an international group of insurance and related financial services firms.

The petitioners, Highfields Capital Ltd., Highfields Capital I L.P., and Highfields Capital II L.P. (collectively, "Highfields"), are affiliated partnerships that have invested private funds on behalf of their limited partners since 1998. At the time of the AXA–MONY merger, Highfields owned 2,184,000 shares, or just over 4.3%, of MONY's outstanding common stock. In compliance with section 262 of the Delaware General Corporation Law, Highfields perfected its appraisal rights and promptly filed its petition following the transaction.[1]

### B. *The Facts*

#### 1. *An Overview Of MONY's Business*

MONY's predecessor-in-interest, Mutual of New York, was formed in 1842 as a mutual life insurance company. It concentrated its product line on traditional life insurance policies sold through a career agency distribution system.[2]

In the late 1980s, the insurance market became increasingly consolidated and competitive. Advances in both efficiency and scale were necessary for a life insurance company to maintain an edge as the industry evolved. These competitive pressures were a substantial causative factor in Mutual of New York's decision to demutualize in the fall of 1998. On the heels of this process and following the completion of the company's initial public offering at $23.50 per share, MONY listed on the New York Stock Exchange.[3]

Following its demutualization, MONY sought to regain some of the competitive advantage it had lost during the late 1980s and throughout the 1990s. One strategy MONY employed was to diversify its product lines. Freed of the regulatory requirements which prevented its predecessor as a mutual company from branching into financial services areas outside of traditional life insurance, MONY quickly attempted to adapt through a flurry of smaller acquisitions. Between January 2000 and November 2001, MONY acquired Advest (a brokerage firm), Lebenthal (a bond company), and Matrix (an investment bank). In December 2002, the company

---

1. On September 30, 2004, Cede & Co., as the recordholder of MONY shares beneficially owned by Don Siegal, filed an appraisal petition. The court, pursuant to an order dated February 24, 2005, consolidated the two actions and appointed Highfields's counsel as lead counsel for all petitioners.

2. In this type of distribution system, retail insurance agents sell the products of only one insurance company.

3. This price represented approximately 65% of MONY's then existing GAAP book value.

also discontinued its underperforming group pension business.

Despite its efforts to diversify its product offerings, MONY still faced substantial deficiencies in its business model that caused it to lag behind industry leaders. The company's career system distribution network was expensive to maintain, as more and more agents demanded the ability to sell third-party insurance products. Moreover, MONY lacked scale, a crucial element to success in a marketplace teeming with large, globally-based financial services companies. MONY's products, especially life insurance policies, were highly commoditized, meaning that the most significant factor in the company's continuing viability was its operating efficiency relative to other firms. Because competitors benefited from greater economies of scale, MONY was forced to lower its prices on insurance products to maintain sales volume. This tactic led to lower operating margins and sagging earnings for the company.

MONY's inability to efficiently generate profitable new business was not the sole reason for its earnings problems. Shortcomings existed in the company's historical book of business as well. As a mutual company, Mutual of New York had not priced its policy premiums at maximum possible levels. After demutualization, MONY continued to hold a large, yet underpriced, book of business at a much higher percentage of assets or total revenues than its competitors. Thus, MONY's return on equity was materially below that of its peers due to the drag on earnings created by these inefficiently priced policies.

Unfortunately for MONY, in the insurance industry, low earnings beget still lower earnings. Because of capital, liquidity, and earnings concerns associated with the company, MONY suffered near continuous pressure from the ratings agencies in the post-demutualization period.[4] In the insurance industry, ratings matter greatly, since agents, creditors, and customers all view a company's ratings trend and ratings outlook as strong indicators of an insurer's ability to satisfy its current and future financial obligations. Low debt ratings affected MONY's cost of borrowing and, in turn, its earnings levels.

More importantly, low ratings send a signal of a higher risk investment to prospective policy purchasers. Rational investors demand larger returns in exchange for such risk. This incontrovertible law of the free market presented MONY with a Hobson's choice: either acquiesce to investor demands by pricing policies to increase investor returns (thereby writing barely profitable or unprofitable business), or continue trying to sell overpriced, commoditized products in a competitive industry (thereby confronting decreased sales volume and unhappy sales agents fleeing to firms where they could enjoy greater commissions). Objectively speaking, a period of rating downgrades would spell disaster for MONY, and these downgrades were an ever present possibility for the company in the early 2000s.

In the face of these difficulties, MONY actively explored strategic alternatives to enhance stockholder value and to brighten the company's future. In addition to diversifying its business lines through the acquisitions mentioned above, MONY initiated cost-cutting measures that closed certain distribution facilities, realigned agency locations throughout the country, and laid

---

4. In late 2002, two agencies lowered MONY's senior debt credit ratings and financial strength ratings.

off hundreds of employees. In late 2002, MONY's management devised a long-term cost-reduction and restructuring plan, the more substantive elements of which entailed further realignment of the company's distribution network, a relocation of MONY's corporate headquarters, and adjustments to incentive-based executive compensation. Based on the evidence presented at trial, however, it was clear that MONY's management poured most of its creative efforts into a different strategic alternative that eventually bore fruit: a merger or sale of the company.[5]

### 2. AXA And MONY Agree To Merge

In 2001, MONY's board of directors informed management of its general consensus that a business combination with a third party was likely to provide MONY with its best opportunity for long-term success. By late 2002, a general downturn in the capital markets, coupled with the industry-specific and ratings agency pressures MONY faced, finally led to an intensification of management's efforts to locate a potential acquiror. At that time, Credit Suisse First Boston ("CSFB"), one of MONY's strategic financial advisors, counseled management to obtain a third-party actuarial appraisal to identify cost savings that might be available to a merger partner. Instead of announcing a public auction of MONY, an option which the board

believed might highlight dangerous weaknesses in the company to competitors, the board instructed Michael Roth, MONY's president and chief executive officer, to quietly explore combination opportunities.

Despite the low key approach the board took in finding a purchaser, the marketplace harbored little doubt about MONY's candidacy as a potential acquisition target. Investment bankers, industry analysts, and insurance company executives all understood that MONY's days as a standalone entity were likely numbered.[6] Even the timing of a transaction was somewhat predictable, since the 5% ownership restriction imposed by New York state insurance regulations was set to expire in November 2003.[7] Despite strong informational signals that MONY was on the selling block, but perhaps precisely because the market knew such a sale was an eventuality in the not-too-distant future, potential suitors, when approached by MONY's management, balked at the suggestion of a transaction due to concern that MONY's existing stock price was too high.

Unlike other possible buyers, AXA showed an interest in MONY. In the fall of 2002, Roth met with Kip Condron, the president and chief executive officer of AXA, to gauge AXA's general interest in a deal, without specifically discussing price. At a follow-up meeting in January 2003,

---

5. Although MONY probably would have been able to implement structural changes that would have resulted in at least a portion of the $47.2 million in savings the restructuring plan targeted between October 2002 and August 2003, there is no credible evidence that any of these changes were ever implemented, and estimating a firm figure for the savings achieved would be a highly speculative undertaking for the court. Indeed, Highfields's own expert testified at trial that he did not know how much cost saving was ultimately achieved, or whether any material difference existed between MONY's budgeted and actual expenses for 2003. Trial Tr. 337–38.

6. Indeed, MONY was "on everybody's list and had been for a number of years," so much so that the company's probable acquisition "was a source of almost constant conversation among investment bankers, CFOs and CEOs of insurance companies." Trial Tr. 649, 770.

7. For the five-year period following MONY's demutualization, a potential acquiror would have had to obtain special approval from the New York Insurance Department to acquire more than 5% of MONY.

Condron mentioned $26 per share as an approximate acquisition price, marking the first time that any potential buyer talked of a specific price for MONY's stock. The two companies executed a confidentiality agreement in February 2003, and MONY thereafter formally retained CSFB as a financial advisor in connection with the potential transaction.

Following more than a month of due diligence, Condron told Roth that AXA would be willing to consider a transaction to acquire MONY at as much as $28.50 per share in cash. AXA pulled that proposal in April 2003, however, when it determined that change in control agreements benefiting MONY's management were worth nearly $163 million. Instead, AXA proposed a stock-for-stock merger using AXA's American Depository Receipts at a fixed exchange ratio valued at $26.50 per share at the time. The MONY board rejected the proposal due to the stock component of the deal, as well as the fact that the fixed exchange ratio effectively required MONY stockholders to make a currency bet on the U.S. dollar versus the euro during the time between deal announcement and closing.

In the months following the termination of negotiations between MONY and AXA, MONY continued to face a market devoid of willing buyers. Eager to increase the company's sale prospects, MONY's board negotiated new change in control pay-

ments for management, greatly reducing the payout provisions.

In the fall of 2003, negotiations resumed between AXA and MONY, which ultimately led to AXA's offer to acquire MONY for $31 per share in cash. Following consultation with financial and legal advisors, as well as senior management, the MONY board concluded that the $31 per share price was fair and was the best way to maximize stockholder value. Absent a transaction, the board believed the company would continue to deteriorate due to its lack of scale, its reliance on a fundamentally flawed, high-cost field agency system, and its inability to adapt to competitive pressures in the financial services industry.[8]

### 3. Uncertainty Follows The Merger Announcement

The merger was announced on September 17, 2003, and represented a 7.3% premium over MONY's then current trading price. During a conference call with MONY management the following day, a number of institutional investors criticized the $31 price—approximately 76% of MONY's GAAP book value at the time—as being too low.[9] Despite having no written documentation or analyses with which to justify a conclusion that AXA's offer substantially undervalued MONY, Highfields became a vocal opponent of the deal and publicly advocated for stockholders to reject it.[10] Two proxy advisory firms, Insti-

---

**8.** Without a buyer, the directors and officers of MONY were convinced that the company's prospects were dire. *See* Theobald Dep. 51–53 (noting that MONY would likely be sold at scrap value absent a synergistic sale); Foti Dep. 288–89 (noting that there was a "significant risk that [MONY] would face a meltdown scenario" if the AXA transaction did not happen).

**9.** Southeastern Asset Management, MONY's largest stockholder at the time, called the

offer "ridiculously low" and labeled the board's actions "egregious." Third Avenue Funds described MONY stockholders as being "cashed out at a disgraceful number." JX 977 at 11.

**10.** On January 29, 2004, Highfields sent a letter to MONY stockholders urging them to vote against the merger. JX 141 at 1. Based on the merger price, Highfields's equity stake in MONY was worth almost $68 million, yet, apparently "consistent with [Highfields's] pol-

tutional Shareholder Services ("ISS") and Glass–Lewis & Co., also reacted negatively, relying on what they believed to be a relatively small premium offered by AXA and a low price-to-book value for the acquisition. Numerous insurance industry analysts, however, believed that the merger would deliver solid value to MONY stockholders.[11]

Public opinion surrounding the deal was further complicated by AXA's proposed method of financing. To raise capital to pay for the acquisition, AXA issued in France corporate debt instruments called ORANs.[12] A number of institutional investors with sizeable holdings in MONY stock, including Highfields, purchased substantial positions in these securities following the merger announcement. It was well understood at the time that investors with long positions in the ORANs had incentives to acquire MONY shares in support of the merger, while investors with short positions in the ORANs had motivation to impede the transaction.

On February 3, 2004, Highfields made a $15.4 million short sale in ORANs, and, following a later trade on February 11, Highfields's short position in the ORANs grew to $40.6 million. Two weeks later, in a publicly filed letter to this court, but without revealing its own short position, Highfields urged that the vote of stockholders with long positions in the ORANs be abridged, claiming that such stockholders had financial interests contrary to those of other investors in MONY stock. During this time, Highfields never disclosed to the market that, if the merger was voted down, its short position in the ORANs would allow it to make an $11 million profit on an investment it had held for only a few months.

Not surprisingly, the merger quickly became the subject of expedited stockholder litigation in this court. Stockholder plaintiffs claimed that, among other things, the MONY directors breached their fiduciary duty to obtain the highest value reasonably available for stockholders in the sale of the company.[13] This court ultimately concluded on a thoroughly presented preliminary injunction record that the MONY board acted in accordance with its fiduciary obligations under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[14] and its progeny by accepting AXA's $31 per share proposal, and that "there was ample room for the [MONY] board to make a good faith and honest determination that approval of the

icy" to store "work ... [in employees'] heads" on valuation matters, it prepared no analytical documentation to quantify how much more than $31 per share MONY was worth at the time. Trial Tr. 109–10.

**11.** Citigroup analysts commented that "[a]lthough this valuation appears low at first, we believe that it is actually fair given that MONY is a 2.0% [return on equity] in a sector that currently returns approximately 12.0%." JX 1119. Fox–Pitt, Kelton believed that "AXA's bid to acquire MONY is fairly valued at this time" and did not expect a higher bidder to emerge. JX 1129. Lehman Brothers wrote that "[t]he price appears to be reasonable at 75% of reported book value." JX 1136. Deutsche Bank claimed that "[i]n light of the price multiples offered for ... other recent

transactions, we continue to believe that AXA's offer of $31, or 0.76x non-FAS 115 book value, for the MONY franchise is a fair price." JX 1135.

**12.** The ORANs, or Obligations Remboursables en Action ou en Numeraire, were debt securities issued by AXA Group and were structured to automatically convert into AXA stock upon the closing of the MONY merger.

**13.** *See generally In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9 (Del.Ch.2004) ("*MONY I*"); *In re MONY Group Inc. S'holder Litig.*, 853 A.2d 661 (Del.Ch.2004) ("*MONY II*").

**14.** 506 A.2d 173 (Del.1985).

merger ... was in the best interests of the corporation." [15]

As the prospects for the transaction darkened due to discontent among institutional investors in early 2004, MONY management's gloomy predictions of a ratings downgrade looked set to materialize if the merger fell through.[16] During February 2004, all of the ratings agencies lowered at least MONY's ratings outlook, largely as a result of uncertainty surrounding the outcome of the AXA deal.[17] Analysts familiar with the business echoed management's concerns that the merger was essential to ensure that MONY did not suffer the financial fallout likely to result from a further credit rating slip.[18]

In the end, AXA's $31 per share offer remained outstanding for eight months. Despite AXA's public statements that it would not increase its offer, no prospective buyer submitted a higher bid. The stockholder vote went forward on May 18, 2004, and was approved by 51% of the stockholders. The transaction closed on July 8, 2004. At the time, holders of 16.7% of MONY's shares indicated they would exercise appraisal rights. Ultimately, however, Highfields was the only substantial stockholder to prefect an appraisal demand.[19]

### 4. The Procedural Posture Of This Litigation

Highfields filed its appraisal petition on November 4, 2004. Following extensive fact and expert discovery, a trial was held from April 30, 2007 to May 3, 2007. Post-trial briefing was submitted, and the court heard post-trial oral argument on June 27,

---

**15.** *MONY II*, 853 A.2d at 667–68 (citing *MONY I*).

**16.** Management's concerns are expressed in a file memorandum written by MONY's chief financial officer, Richard Daddario, on February 12, 2004:

> We believe that the most likely scenario is that upon announcement that the transaction has not been approved MONY's rating will be downgraded by one notch.... In addition, unless results improve dramatically, we believe that the negative outlook could result in another one notch downgrade in late 2004 or perhaps in 2005. A combination of the downgrade and the added uncertainty created by the unsuccessful transaction adds significant risk to the MONY organization.

JX 66.

**17.** On February 5, 2004, Fitch changed MONY's financial strength rating from "rating watch positive" to "rating watch evolving." On February 19, 2004, S & P downgraded MONY's financial strength rating to "A" and placed this rating on "credit watch developing." The same day, A.M. Best changed its rating of MONY from "under review—positive" to "under review—developing." On February 23, 2004, Moody's altered MONY's rating from "review for possible up-

grade" to "direction uncertain." JX 60 at 33–37.

**18.** Goldman Sachs observed that "[t]he rating agencies have downgraded MONY due to the uncertainty surrounding the completion of the deal and have indicated that ratings could slip further if the deal is not done. If downgraded again, MONY's insurance company could struggle with increased lapses, questions about liquidity, and lack of sales." JX 1134. Morgan Stanley stated that "[i]f ... MONY is left to make a go of it alone, the situation could be rather unpleasant. Once an insurance company's financial strength comes under question, the sale of new product, retention of its sales force and maintaining persistency of its in-force block will become challenging. At this point, ratings will drop further and the company will essentially go into run-off." JX 1133.

**19.** The ten largest institutional investors in MONY held roughly 24% of the company's outstanding common stock at the time of the merger. Several of these large stockholders who ended up accepting the $31 merger consideration (Southern Asset Management and Third Avenue Funds) were the same ones who originally attacked the deal for undervaluing MONY.

2007. That same day, the parties stipulated to, and the court entered, an order setting the pre-judgment interest rate in this action at 6.2%, compounded semi-annually, running from July 8, 2004.

## II.

In a section 262 appraisal proceeding, the court must "determine the fair value of 100% of the corporation [and award] the dissenting stockholder his proportionate share of that value."[20] This evaluation requires an examination of "all factors and elements which reasonably might enter into the fixing of value," including market value, asset value, earning prospects, and the nature of the enterprise, which are "known or susceptible of proof as of the date of the merger."[21] The corporation subject to valuation is viewed as a going concern "based upon the 'operative reality' of the company at the time of the merger."[22] This value must be reached regardless of the synergies obtained from the consummation of the merger,[23] and cannot include speculative elements of value arising from the merger's "accomplishment or expectation."[24]

However, the value of a petitioner's shares may not reflect discounts for lack of marketability or illiquidity.[25]

It is well established that "fair value" for purposes of appraisal is equated with the corporation's stand-alone value, "rather than its value to a third party as an acquisition."[26] If, however, the transaction giving rise to the appraisal resulted from an arm's-length process between two independent parties, and if no structural impediments existed that might materially distort "the crucible of objective market reality," a reviewing court should give substantial evidentiary weight to the merger price as an indicator of fair value.[27]

Fundamentally, a Delaware court must employ a liberalized approach to valuation embracing "proof of value by any techniques or methods which are generally considered acceptable in the financial community."[28] Both parties "have the burden of proving their respective valuation positions by a preponderance of the evidence."[29] However, if neither party adduces evidence sufficient to satisfy this burden, "the court must then use its own

20. *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at *9 (Del.Ch. Feb.22, 1988), *aff'd*, 564 A.2d 1137 (Del.1989).

21. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del.1983); *Tri–Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del.1950).

22. *M.G. Bancorp., Inc. v. LeBeau*, 737 A.2d 513, 524 (Del.1999).

23. *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del.1999).

24. 8 *Del. C.* § 292(h). *Ng v. Heng Sang Realty Corp.*, 2004 WL 885590, at *6 (Del.Ch. Apr. 22, 2004).

25. *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 147 (Del.1980).

26. *M.P.M Enters.*, 731 A.2d at 795.

27. *See Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del.Ch. Mar. 7, 1991) ("The fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair."). *See also Dobler v. Montgomery Cellular Holding Co.*, 2004 WL 2271592, at *11 (Del.Ch. Sept. 30, 2004), *aff'd in relevant part*, 880 A.2d 206 (Del.2005) (citing *M.P.M. Enters.*, 731 A.2d at 797, for the proposition that "a merger price resulting from an arm's-length negotiations where there are no claims of collusion is a very strong indication of fair value").

28. *Weinberger*, 457 A.2d at 713.

29. *M.G. Bancorp*, 737 A.2d at 520.

independent judgment to determine fair value." [30]

## III.

### A. *The Parties' General Contentions*

Based on its experts' testimony, Highfields posits that MONY's fair value on July 8, 2004 was between $37 and $47 per share. Highfields argues that the $31 per share merger price is an unreliable indicator, and only reflects the company's value to AXA as a buyer rather than its value as a going concern. According to Highfields, in the absence of the merger, MONY was poised for success because of management's dedication to growing revenues and cutting expenses in the future.

Moreover, Highfields contends that AXA's valuation methodologies are flawed because: (1) they rely on an improper elimination of $600 million from MONY's DAC and goodwill; (2) they do not account for the strong performance of the equity markets from September 2003 to July 2004, which allegedly would have increased MONY's going-concern value were it not for an effective $31 per share cap on the stock price; and, (3) they wrongly attribute a great deal of the appreciation in the company's stock price in the months before the deal's announcement to merger speculation. In the end, Highfields contends that the opposing expert's reliance on actuarial models and assumptions created by AXA, an interested party on the buy side of a transaction, was unreasonable, and that AXA has failed to show by a preponderance of the evidence that its expert properly applied any relevant valuation metric.

In response, AXA argues that the going-concern value of MONY as of July 8, 2004 was no more than $21 per share. AXA says that the merger price, less synergies, is the best indicator of value in this case because of the arm's-length negotiation process employed and the lack of material impediments to a topping bid. According to AXA, the standardized valuation methodologies applied by its expert also support a value which approximates this market-based approach. AXA argues that Highfields's valuation work uses improper assumptions and inputs, and that AXA's own conclusions—particularly with respect to MONY's market appreciation post-announcement, the $600 million DAC write-down, and investors' understanding that MONY would likely be acquired—are borne out by the evidence. Ultimately, AXA contends that MONY was a troubled business facing a dire and unprofitable future due to inherent, irreparable deficiencies in its system of operation, unyielding pressure from competitors, and constant monitoring from ratings agencies.

### B. *The Experts And Their Testimony*

Four experts testified at trial, three on behalf of Highfields and one on behalf of AXA. However, only one of Highfields's experts actually opined as to MONY's fair value. The court now turns to the evidence those individuals presented.

#### 1. *The Non–Valuation Experts*

##### a. *Edward W. Buttner*

Edward W. Buttner is a certified public accountant licensed in Florida.[31] Buttner

---

**30.** *Taylor v. Am. Specialty Retailing Group, Inc.,* 2003 WL 21753752, at *2 (Del.Ch. July 25, 2003).

**31.** After graduation from Jacksonville University in 1976, Buttner spent 16 years with the accounting firm of Ernst & Young,

where he specialized in accounting, auditing, and consulting for insurance companies. As a partner at Ernst, he directed valuation engagements on insurance companies, and supervised statutory and GAAP financial statement examinations on more than 25 in-

has given expert witness testimony in state and federal courts on numerous occasions with respect to accounting and auditing issues in the insurance industry.

At trial, Buttner testified on behalf of Highfields regarding the propriety of certain pro foma accounting adjustments made by MONY management and used by CSFB in its February 2004 valuation of the company. Specifically, Buttner opined that a pro forma $600 million reduction in MONY's book value, which resulted from a hypothetical 50% write-down of the company's deferred acquisition cost asset ("DAC") and 100% of its goodwill, was inappropriate under financial reporting standards used in the insurance industry.[32] Buttner also testified that the pro forma replacement of these assets with a hypothetical value of business acquired asset ("VOBA"), a purchase accounting concept normally used by the purchaser of an insurance company, was an unreasonable decision by MONY's management.

Buttner noted that, according to GAAP reporting standards, the amount of DAC an insurance company may capitalize on its books should not exceed the present value of future profits generated by in-force business.[33] If MONY's DAC or goodwill were ever impaired before the merger, the company would have written those assets down in accordance with GAAP financial reporting standards.

However, instead of using GAAP book value in preparing its fairness opinion, each of the valuation metrics CSFB used relied upon the hypothetical $600 million DAC–VOBA substitution. MONY management arrived at this figure by calculating the rate of return a potential acquiror would look for in considering whether to purchase MONY, and then backing out the amount by which the potential acquiror's VOBA would exceed MONY's then-existing DAC and goodwill. Buttner testified that this effective revaluation of assets would not have been available to MONY if the company continued as a stand-alone entity, and that CSFB's fairness opinion improperly understated MONY's fair value because of the DAC–VOBA substitution.

On cross-examination, Buttner admitted that, if MONY was considering a sale, the DAC–VOBA adjustment would be a relevant criterion in determining what an acquiror might pay. An acquiror would be interested in this adjustment because an elimination of the DAC asset and the establishment of a smaller VOBA asset would offer the potential for a meaningful GAAP earnings improvement for MONY. Moreover, since purchase accounting standards would require a buyer to eliminate goodwill and DAC, while replacing those assets with the acquiror's own calculations as to the value of MONY's in-force business, a hypothetical DAC–VOBA substitution would be of great importance to

surance concerns. When Buttner left Ernst in April 1992, he was the partner-in-charge of the firm's Florida insurance practice. Since May 1992, Buttner has continued to provide accounting and consulting services to insurance companies as a partner in Buttner Hammock & Co., P.A.

32. DAC reflects an accounting treatment given to up-front, variable costs related to an insurance company's generation of new business, including commissions paid and underwriting expenses. DAC is capitalized, and then amortized to correspond with the amount of time the policy that generated those costs is outstanding.

33. MONY's DAC was tested for impairment quarterly. PricewaterhouseCoopers, in making its 2003 fiscal year report to MONY's audit committee, noted that the company's DAC was recoverable, and its goodwill was not impaired. Indeed, the auditor thought the treatment of these assets was appropriate and more conservative than industry practice.

MONY's board in reviewing the range of values at which an acquiror might proceed with a sale.

b. *Michael P. Borom*

Highfields also relies upon the expert testimony of Michael P. Borom, one of the founding partners of Impala Partners, LLC, a financial advisory boutique. For the last 10 years, Borom has provided restructuring advice to financial services and insurance-related companies such as Conseco and Leucadia National Corporation.[34]

In preparing his expert report, Borom analyzed MONY's revenues and net income from 2001 to 2003. Borom testified that trial that MONY was a healthy company, one which experienced overall revenue growth of 11% in both 2002 and 2003. The growth in MONY's insurance business during the pre-merger period, according to Borom, was substantially attributable to a sizable increase in the company's sale of corporate-owned life insurance policies ("COLI"), an item which MONY's management had focused on improving. The success of MONY's asset management wing, however, correlated to trends in the capital markets during this time frame, showing lulls in performance during 2001 and 2002, but a general trend upward in 2003. The brokerage and investment banking line of the company showed steady revenue growth from 2001 to 2003. Borom opined that these positive trends in MONY's business would likely have continued in the first half of 2004.

In analyzing the company's pre-tax net income from 2001 to 2003, Borom made certain adjustments for "unusual and timing items" specific to the insurance industry. He also normalized MONY's capital gains by removing all capital gains and losses from the period, and then substituting for those figures the company's five-year average for capital gains. This analysis produced a steady increase in MONY's pre-tax net income for the period, which rose from $17.8 million in 2001, to $31.1 million in 2002, to $55 million in 2003. Borom believed that this upward trend in net income would likely have continued in 2004 before the AXA merger closed.

Furthermore, Borom testified as to the viability of management's proposed cost reduction plan. Borom testified that $45 million of the projected $47 million in expense savings would have been both attainable and sustainable for MONY over the long term if the merger with AXA never occurred. In his opinion, several factors, including management's support for the cost-saving initiatives, outside pressure from stockholders and ratings agencies, and the fact that MONY was near the bottom of the industry in terms of operating efficiency, all made it more likely than not that the company would have succeeded in realizing these expense savings.

Finally, Borom took issue with the February 2004 management projections which CSFB relied on in preparing its fairness opinion. Based on numerous meetings and consultations with ratings agencies during his career, Borom claimed it was unreasonable to assume that, barring consummation of the AXA merger, MONY would have suffered another ratings downgrade in late 2004 or early 2005. Finally, Borom commented that the $31 price

---

34. His engagements with these companies have included issues regarding valuation, debt restructuring, cost-reduction plan implementation, and rating agency presentations. Borom is a graduate of Colgate University, and began his career at General Electric in the company's financial planning and analysis department. He served as chief financial officer of GE Capital's mortgage insurance arm from 1991 to 1995. Borom was also chief financial officer of Aetna's property casualty insurance subsidiary from 1995 to 1996, and worked intensively on valuation issues during Aetna's sale of that portion of its business.

AXA's expert used to calculate the shared synergies generated by the merger was too low. In Borom's view, monetary incentives on the part of management to get a deal done, the lack of an open auction at the beginning of the sale process, and the significant due diligence costs a topping bidder would incur to intelligently make a bid were all structural impediments that distorted the sale process in AXA's favor.

On cross-examination, Borom admitted that, despite MONY's growth in net income under his analysis, the company's return on equity was still between 1% and 2%, and at the bottom of the insurance industry. Furthermore, Borom agreed that a ratings downgrade would have had a significant negative impact on the company's COLI sales, the area where MONY was achieving its highest rate of growth. Borom also admitted that the only major differences between management's August 2003 projections (which he relied on) and its February 2004 projections (which CSFB relied on) were attributable to the downgrades MONY received from the ratings agencies in mid-February 2004. He agreed that the February 2004 projections assumed the implementation of the expense reduction initiatives he discussed during his direct testimony, and also assumed that MONY could avoid further ratings downgrades through remedial ac-

tion if the merger failed to close. Finally, Borom noted that he was never provided with, and never analyzed, any of the industry analyst reports supporting the $31 price as fair; instead, he relied only on fairness assessments prepared by ISS and Glass–Lewis.

#### 2. *The Valuation Experts*

Both Highfields and AXA presented valuation experts. Highfields's valuation expert is Dr. Israel Shaked, a professor of finance and economics at Boston University's School of Management. For nearly 30 years, Shaked has taught courses at the graduate and undergraduate levels on various topics, including business valuation and corporate finance.[35]

AXA's valuation expert is Peter C. Jachym, a managing director of Keefe, Bruyette & Woods ("KBW"), an investment banking firm that focuses exclusively on the financial services industry.[36] Within the past few years, Jachym has worked on SunLife's acquisition of Keyport Life and the sale of Forethought Insurance to a private investment firm called The Devlin Group.[37]

#### a. *Shaked's Testimony And Jachym's Rebuttal*

Shaked testified that the fair value of MONY as of July 8, 2004 was $43.03 per

---

**35.** Shaked graduated from the Hebrew University of Jerusalem and later earned a doctorate in business administration from Harvard Business School. Shaked also acts as managing director of the Michel–Shaked Group, a financial consulting firm which he co-founded. In the past, Shaked has been retained as an expert or consultant concerning valuation and financial condition issues in a number of cases involving insurance and financial services companies, but never in the context of valuing a life insurance company.

**36.** On a year-to-year basis, KBW does a greater number of merger and acquisition transactions for the financial services industry

(banks, insurance companies, broker-dealers, and asset managers) than any other investment bank in the United States.

**37.** Before joining KBW in 2001, Jachym worked for a number of other investment banking firms, including Merrill Lynch and Banc of America Securities, where he specialized in valuation, capital raising, and sale transactions in the insurance industry. Jachym attended Yale University for his undergraduate studies, and received a masters degree in business administration from the Amos Tuck School of Business at Dartmouth College.

share. He reached this conclusion using three traditional valuation methodologies. First, Shaked employed a discounted cash flow ("DCF") analysis based on assumptions taken from management's August 2003 projections. Shaked considered these projections more authoritative than the February 2004 projections on which CSFB relied because, according to him, the August 2003 projections were made when management was still valuing MONY as a stand-alone entity. He used a 5.0% terminal growth rate in his analysis, which was derived from IBES, an authoritative source that compiles growth rates for certain companies based on estimates of different institutional investors. Shaked's 8.9% discount rate came from the Capital Asset Pricing Model formula, and was consistent with the discount rates AXA applied to value MONY from May to September 2003. Shaked arrived at a price of $39.18 per share for MONY's stock under the DCF formula, which he weighed at 50% in his overall analysis.[38]

To compile a list for his comparable company valuation, Shaked combined the businesses included in the S & P 500 Life and Health Insurance Index (the "L & H Index") with the companies CSFB identified in its February 2004 presentation to MONY's board. He then eliminated companies whose market capitalization was more than ten times greater than MONY's. This process yielded 13 comparable companies.

Shaked used a price-to-book value multiple for this analysis, rather than a price-to-earnings multiple. He testified that price-to-earnings multiples are not typically used to value life insurance companies, and that, if one were applied using MONY's 2003 earnings, the result would have been

a multiple of 97.33. Given that MONY's stock was trading at $28.20 at the time the merger was announced, a price-to-earnings multiple would not have been a reasonable metric. AXA agrees with Shaked on this point.

Because of MONY's low earnings and due to its below-average financial strength rating, Shaked derived a multiple for MONY of .89 from the lower quartile of companies he examined. To remove the minority discount, Shaked compiled a list of 55 transactions involving financial acquirors from July 8, 1999 to July 8, 2004 in which more than $200 million was paid and in which at least 51% of the company was purchased. This yielded a median minority discount of 30.1%. Shaked multiplied MONY's book value per share of $40.24 (which omitted the $600 million write-down of DAC and goodwill) by .89, and then added in the 30.1% minority discount. By doing so, he arrived at a price for MONY of $46.69 per share under his comparable company analysis, which he weighed at 30% in his overall valuation.[39]

Shaked also employed a comparable transactions analysis. He examined life insurance acquisitions between July 8, 1999 and July 8, 2004 involving entire enterprises (as opposed to transactions where a line or division of a conglomerate was sold) where at least 51% of the target was acquired at a cost of at least $200 million. After excluding deals which were ten times greater than the AXA–MONY merger, Shaked ended up with a list of seven transactions.

Based on price-to-book value, the MONY merger was assigned a multiple of 1.37, in the lower quartile of the comparable transactions. After removing a 14.5% synergy premium from the MONY transaction, he arrived at a value of $47.15 for

---

**38.** The range of values under Shaked's DCF is $34.85 to $50.69 per share.

**39.** Shaked's comparable company analysis returned a range of $41.45 to $51.92 per share.

each share of MONY stock using his comparable transactions analysis, which he weighed at 20% overall.[40]

Shaked also undertook a market price analysis to gauge how MONY's stock price would have reacted to appreciation in the capital markets from September 17, 2003 to July 8, 2004 without what he contends was an effective cap of $31 per share resulting from the pendency of AXA's offer. Shaked took MONY's stock price a month prior to the merger announcement ($28.20), adjusted for a minority discount, and multiplied this figure by MONY's expected percentage return based on the appreciation of the L & H Index during the relevant period.[41] Doing so, Shaked arrived at $42.22 as an expected unaffected price for MONY's stock (on a control basis) as of July 8, 2004.[42]

To rebut the evidence Shaked presented, Jachym testified at length regarding what he believed were fundamental flaws in Shaked's analyses. First, Jachym noted several thematic shortcomings in Shaked's presentation. Shaked never used financial data derived from an actuarial appraisal, despite the fact that actuarial appraisals are the industry norm for valuation of a life insurance company. Also, Shaked paid no attention to the actual $31 per share price AXA paid, even though MONY was acquired through an arm's-length bargaining process. Moreover, Shaked used dated managerial projections from August 2003 throughout his report, projections prepared before MONY suffered a ratings downgrade in February 2004.

Jachym testified that Shaked's valuation methodologies are unreliable. In Shaked's DCF analysis, GAAP earnings estimates are used, which do not equate with cash flows in the life insurance business due to capital retention and dividend maintenance requirements. Also, Jachym stated that Shaked improperly arrived at MONY's terminal value by growing projected earnings at a constant rate. According to Jachym, Shaked erred in his comparable company analysis by assigning MONY multiples based on the median of the bottom quartile of each model, even though MONY was outperformed by companies at the very bottom of the list. Finally, Jachym stated that Shaked's comparable transactions model is flawed because it completely ignores the Safeco transaction,[43] which was the most similar in size, timing, and financial performance to the MONY deal. Jachym adamantly disagreed with Shaked's contention that Safeco was a distressed sale, noting that Safeco's parent company had capital raising alternatives and that the availability of Safeco's statutory financial statements would have precluded any material marketability discount.

As to Shaked's calculation of a control premium for the transaction, Jachym noted that Shaked used transactions involving both financial and non-financial institutions to calculate his figure, an improper technique considering regulatory constraints on dividends and cash flows to stockholders typically result in lower control premi-

---

**40.** The range of values for Shaked's comparable transactions metric is $43.71 to $50.59 per share.

**41.** To perform this calculation, Shaked found that the value of the L & H Index increased by 21.7% during the relevant period. MONY's beta to that index was .69. Thus, MONY's expected return for the period, according to Shaked, was 15.1%.

**42.** This figure reflects the elimination .of a 30.1% minority discount. If the AXA expert's minority discount of 16.7% is used, one arrives at an unaffected price of $37.68.

**43.** This deal involved the March 15, 2004 purchase of Safeco Life & Investments by a group of investors (including Highfields).

ums being paid to acquire a financial institution. As to Shaked's synergy premium calculation, Jachym testified that the transactions Shaked relied on were not comparable to the AXA–MONY merger, and that they occurred in the bull market of the late 1990s when the typical merger premium was inflated in comparison to 2004 standards. Finally, Jachym claimed that MONY's stock price was artificially inflated by merger speculation at the time of the transaction. He stated that Shaked's trading volume analysis and event study were poor indicators of an inflated price in this case, since those models examine the effect of a single event or a single piece of information on a stock's price, rather than testing for the presence of a long-term price condition. Indeed, Jachym noted that MONY was operationally underperforming firms in its peer group from March 13, 2003 to September 17, 2003, yet the company's stock outperformed that same group by approximately 25% during the same time period.[44]

### b. *Jachym's Testimony And Shaked's Rebuttal*

Jachym testified that the fair value of MONY as of July 8, 2004 was $20.80 per share. He used five different metrics in forming this conclusion. The first method involved a shared synergies analysis, wherein Jachym assumed that the price AXA paid ($31 per share), less synergies derived from the transaction that AXA was willing to share with MONY stockholders ($7.75 per share), was the best indicator of the company's value as a going concern because no material impediments existed to a competing bid. Jachym derived the synergy value of the transaction from AXA's September 2003 board presentation, and from valuation materials created by CSFB in February 2004 for MONY's directors. Jachym arrived at a value for MONY of $23.75 per share using a shared synergies approach, and weighed this price at 50% in his overall valuation opinion.

Second, Jachym created a sum-of-the-parts analysis, which he claimed to be the best method by which to value MONY absent an arm's-length transaction. According to Jachym, a sum-of-the-parts analysis was appropriate due to a lack of comparable companies and comparable transactions for MONY, as well as the fact

---

**44.** On cross-examination, AXA's counsel questioned Shaked about his use of capitalized earnings estimates derived from management's August 2003 projections in his DCF analysis. Shaked noted that earnings for insurance companies are normally higher than free cash flows to stockholders, due to, among other things, the effect of DAC amortization. Indeed, AXA's counsel questioned Shaked at length about the professional acceptability of using capitalized earnings as an input in a DCF analysis for an insurance company. Shaked also observed that the earnings estimates he used for 2004 were approximately six times MONY's 2003 actual earnings, while those for 2005 were around 12 times the 2003 numbers. Shaked testified that if MONY management's February 2004 projections were substituted into his model, the DCF value of MONY would have been less than $20

per share. Moreover, Shaked noted that his DCF calculation results in the same value no matter which year is used as the terminal year, and that nearly 100% of MONY's value from his DCF analysis derives from terminal value.

AXA's counsel also attacked Shaked's comparable company and comparable transactions metrics. Shaked admitted that MONY's return on equity for 2004 was projected to be the worst, and was the second worst historically, of any of the comparable companies he analyzed. Furthermore, the returns on equity reported by the target companies in Shaked's comparable transactions analysis were all substantially higher than that of MONY. Despite all of this, Shaked placed MONY in the lower quartile in both his comparable company and comparable transactions analyses, rather than at the very bottom.

that MONY was comprised of three distinct segments (its insurance, brokerage, and asset management businesses).

For the insurance segment, Jachym broke the business down into three components: the adjusted net asset value, the value of in-force business, and the value of future business. Jachym used financial data prepared by MONY as of June 30, 2004, which the company prepared to meet statutory accounting requirements, to arrive at a net asset value figure. To value the in-force and future business, Jachym relied on actuarial projections developed by AXA in September 2003 when it was deciding how much to bid for MONY. Because KBW is not an actuarial firm, Jachym and his team conducted interviews with several of the AXA actuaries responsible for compiling the actuarial model to determine the reasonableness of the assumptions used therein.

Jachym calculated MONY's adjusted net asset value to be $1.02 billion, and assigned values of $74.7 million and $97.9 million to the in-force business and the future business, respectively. He testified that the discount rates used to calculate the latter two figures were consistent with those employed by the actuarial appraisal firm MONY retained in early 2003, and that his valuation of MONY's future business was quite aggressive, considering that AXA ascribed no value at all to this segment when it examined MONY in September 2003.

In valuing MONY's brokerage business, Jachym used a weighted average of comparable company and comparable transactions metrics to arrive at a value of $273.1 million. He testified that a DCF methodology was not used because KBW did not have reliable, contemporaneous projections for the brokerage segment for the necessary time periods.

For MONY's asset management business, Jachym used a weighted average of comparable companies and DCF analyses to arrive at a value of $93.5 million. Jachym testified that, after subtracting the company's long-term debt and adding back holdings of cash and cash equivalents, the total value of MONY using a sum-of-the-parts analysis was $893 million, or $17.68 per share. Jachym weighed his sum-of-the-parts approach at 35% in his overall analysis.

Jachym also applied a comparable company methodology. He selected publicly traded life insurance companies with a market capitalization between $500 million and $5 billion, and then analyzed each firm's price-to-book, price-to-2004 estimated earnings, and price-to-2005 estimated earnings ratios. Jachym testified that, statistically speaking, MONY was the worst performing and most troubled company of any in its peer group. After eliminating an implied minority discount of 16.1%, Jachym arrived at a value of $19.98 per share under the comparable company approach, which he weighed at 7.5% in his overall valuation opinion.

In Jachym's comparable transactions analysis, he selected six relevant acquisitions of life insurance companies that occurred between 2001 and mid-2004. While Jachym assigned a 10% weighting to five of these transactions, he testified that one transaction in particular was highly comparable to AXA's purchase of MONY—the Safeco transaction. Safeco was operationally similar to MONY, and struggled with low returns on equity. At $1.35 billion, the Safeco acquisition was slightly less than the price paid for MONY, and the transaction closed three months prior to the AXA–MONY merger. Thus, Jachym chose to apply a 50% weight to the Safeco transaction, and ultimately derived an $18.83 per share price under

the comparable transactions method after making a 16.1% discount to eliminate synergies. Jachym weighed his comparable transactions metric at 5% in his overall valuation of MONY.

Jachym testified that, in applying a DCF methodology, he looked for financial data that would equate well with MONY's free cash flows available to stockholders. According to Jachym, Shaked's metric of GAAP earnings bears no resemblance to the actual cash flows of an insurance company, but statutory earnings, which he used, do. Jachym characterized his discount rate of 10% as aggressive, and examined discount rates discussed in proxy statements from financial transactions occurring between 1999 and February 2004 to validate the reasonableness of this assumption. Applying these inputs, Jachym arrived at a per share price for MONY of $21.83 as of July 8, 2004, which he weighed at 2.5% in his overall analysis.

To rebut Jachym's opinion, Shaked highlighted certain portions of the KBW analysis which he found to be flawed. He testified that the 10%–12% discount rate used in Jachym's DCF analysis was unduly high, and that the $600 million write-down

of MONY's DAC and goodwill fundamentally skewed Jachym's comparable company and comparable transactions metrics downward. Shaked also stated that Jachym's inclusion of the Safeco transaction in his comparable transactions analysis was inappropriate because it was a distressed sale of a larger company's line of business, rather than the sale of an entire enterprise.

In order to test the validity of AXA's contention that the share price of MONY was artificially inflated at the time of the merger announcement due to market speculation, Shaked conducted an event study and a volume analysis on MONY stock. In the event study, he found that statistically significant abnormal activity in the price fluctuation of MONY's stock rarely occurred from March 13, 2003 to September 17, 2003.[45] In the trading volume analysis, Shaked found that differences in the average trading volumes for MONY stock from January 5, 2001 to March 12, 2003 and from March 13, 2003 to September 17, 2003 were not statistically significant.[46] Shaked concluded that MONY's share price was not materially driven up by market speculation in the time preceding the announcement of the merger.[47]

45. Shaked ran a regression analysis on MONY's stock price versus a "peer index" established by AXA's expert, as well as the L & H Index, between February 19, 2002 and February 13, 2003. Once he derived a "normalized" relationship between the movement of MONY's stock and these indexes, Shaked looked for abnormal activity in the seven months prior to the merger announcement. He found statistically significant variations on only nine trading days for the "peer index," and only two trading days for the L & H Index comparison. On none of these days was there news in the marketplace discussing a possible acquisition of MONY. Shaked testified that if there were rampant merger speculation surrounding MONY in this period, many more statistically significant variations would have occurred.

46. Shaked said that a statistically significant variation between the two periods would have been likely if MONY's stock was trading in anticipation of a merger during the March to September 2003 time frame.

47. On cross-examination, Jachym admitted that he had no statistical analysis to assign a specific dollar amount of merger speculation imbedded in the price of a MONY share, and admitted that some of the price increase in the six months prior to the merger announcement could have been due to upward trends in the equity markets. Highfields's counsel repeatedly questioned Jachym regarding his assumptions as to MONY's potential difficulty in generating profitable new business. Moreover, Jachym admitted that the price-to-book value ratio assigned to Safeco in KBW's comparable transactions analysis did not adjust

## IV.

 As an initial matter, the court finds that neither party fully satisfied its burden of persuasion regarding a valuation of MONY.[48] Generally speaking, however, several of Jachym's models—namely, his shared synergies approach and his sum-of-the-parts/actuarial appraisal analysis—are more credible, and therefore form the underlying basis for the court's determination of fair value in this case. Strikingly, despite the industry standard of using a sum-of-the-parts/actuarial appraisal methodology to value an insurance conglomerate as a going concern, and despite the reliance this court typically places on the merger price in an appraisal proceeding that arises from an arm's-length transaction, Shaked provided no testimony about MONY's value pursuant to these important models.

Shaked's valuation not only suffers because of these analytical gaps, it is also markedly disparate from market price data for MONY's stock and other independent indicia of value.[49] Because Shaked's conclusions substantially deviate from these objective barometers, it is appropriate to use Jachym's opinion as a baseline for the court to formulate its own independent judgment as to a fair value for MONY.

### A. The Experts' DCF Analyses

Typically, Delaware courts tend to favor a DCF model over other available methodologies in an appraisal proceeding.[50] However, that metric has much less utility in cases where the transaction giving rise to

---

for Safeco's unrecognized capital gains and losses, which resulted in a substantial understatement of MONY's value under that particular metric.

**48.** Indeed, the parties' briefs are like two ships passing in the night, with each litigant showing an equal amount of tedium in attacking (often with good cause) every assumption used or conclusion reached by the other party's expert, no matter how minor. In using KBW's shared synergies and sum-of-the-parts analyses as a framework for a fair value determination (while making adjustments based on its own independent business judgment), the court feels compelled to observe that, like democracy was to Winston Churchill, Jachym's work was basically the least worst valuation scheme presented in this case.

**49.** See, e.g., Cede & Co. v. Technicolor, Inc., 2003 WL 23700218, at *4 (Del.Ch. Dec. 31, 2003) (noting that a valuation supported by several independent indicia of value is more reliable than an expert who "does not even attempt to perform reasonableness checks upon his valuation"); Cede & Co. v. Technicolor, Inc., 1990 WL 161084, at *31 (Del.Ch. Oct.19, 1990) (employing market price data not as an independent valuation source, but "as corroboration of the judgment that [an expert's] valuation is a reasonable estimation

of intrinsic value of [the appraised company], exclusive of elements of value arising from expectation or accomplishment of the merger"), rev'd on other grounds, 634 A.2d 345 (Del.1993). For example, Shaked's comparable transactions analysis indicated that MONY should have sold for $55.12 before backing out synergies, a figure 77% higher than the actual merger consideration of $31 per share, and a price at which a bidder topping AXA's bid by $4 per share would have made $1 billion on a $1.75 billion investment. Likewise, Shaked's comparable company analysis ascribes a value to MONY of $46.69, even though on the last day of trading before the announcement of the merger, and given the market knowledge of a likely transaction, MONY stock traded at only $29.33. See also JX 1135 (March 22, 2004 Deutsche Bank report stating that "if the AXA–MNY deal were to fall apart, we expect the MNY stock to trade in the $25–27 range"); JX 1132 (February 11, 2004 Fox–Pitt report stating that "we expect the stock will drop below $30 if the merger is voted down"); JX 125 at 13 (ISS Proxy Report stating that "[c]ommentary from Wall Street analysts suggest MONY may fall into the mid twenties if the merger is not consummated").

**50.** Crescent/Mach I P'ship v. Turner, 2007 WL 1342263, at *9 (Del.Ch. May 2, 2007).

appraisal was an arm's-length merger,[51] where the data inputs used in the model are not reliable,[52] or where a DCF is not customarily used to value a company in a particular industry. While all of these factors influence the court's decision when ascribing weight to an expert's DCF model, only the latter two factors require substantial discussion here.

### 1. Shaked's DCF Analysis

A DCF assigns a value to an enterprise by adding (1) an estimation of net cash flows that the company will generate over a period of time to (2) a terminal value equal to the future value, as of the end of the projection period, of the company's cash flows beyond the projection period.[53] Fundamentally, Shaked's DCF is flawed because it does not estimate cash flows over a time period, but simply capitalizes an earnings estimate for MONY's 2005 fiscal year devised by management in August 2003.

Shaked relies on GAAP earnings to hypothesize a cash flow stream for MONY. However, GAAP earnings are not useful because state regulation materially reduces the free cash flows an insurance company has available for distribution to stockholders by imposing capital retention and dividend set-aside requirements on those earnings. Shaked also improperly uses a constant rate of growth beginning in 2005 to extrapolate his earnings estimates (without presenting any evidence that MONY's earnings would stabilize after 2005). The unreliability of Shaked's "DCF" analysis is further demonstrated by the observation that it yields substantially the same valuation for MONY regardless of whether a five-year, ten-year, or even one-year projection was used, thus rendering the projection time period irrelevant.[54] Indeed, Shaked's DCF becomes nothing more than an extension of 2005 financial projections in which MONY's calculated terminal value represents almost 100% of Shaked's total estimated value of the company.[55]

### 2. Jachym's DCF Analysis

In several ways, Jachym conducted his DCF analysis in a more credible fashion than did Shaked. Jachym did not rely on outdated management projections which

---

51. *See, e.g., Union Ill. 1995 Inv. Ltd. P'ship v. Union Financial Group, Ltd.,* 847 A.2d 340, 359–61 (Del.Ch.2004) (discounting the utility of a DCF analysis in this type of circumstance).

52. *See, e.g., Doft & Co. v. Travelocity.com, Inc.,* 2004 WL 1152338, at *5–7 (Del.Ch. May 20, 2004) (rejecting a DCF valuation because the inputs were not reasonably reliable).

53. *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 917 (Del.Ch.1999).

54. *See Dobler,* 2004 WL 2271592, at *10 (noting that a DCF is meaningless where a projection time period becomes irrelevant because it is essentially nothing more than an extension of one year's financial results).

55. Although his wrongful extrapolation of one year's estimated earnings is by itself sufficient to render Shaked's DCF useless, his use of dated management projections further undermines his DCF calculations. Shaked used August 2003 projections, rather than February 2004 projections. The latter accounted for MONY's then-recent ratings downgrade, and its most recent financial performance (including all of 2003). Truly, it was hopelessly optimistic for Shaked to assume that MONY, as a stand-alone company facing further ratings downgrades and trying to implement cost saving measures which would affect its revenues, would be able to increase its 2005 earnings to 12 times its actual 2003 figures. His utilization of these figures completely ignores the fundamental nature of the enterprise subject to this appraisal proceeding. *Rapid–American Corp. v. Harris,* 603 A.2d 796, 805 (Del.1992) (citing 8 *Del. C.* § 262(h)).

were, by any reasonable measure, not indicative of MONY's future prospects. Jachym also used estimated statutory earnings, which correlate more strongly with cash available for distribution to stockholders, as a proxy for cash flow. But these indications that Jachym's DCF is more structurally sound do not mean the court should blindly rely on Jachym's application of this metric.

As the evidence at trial showed, industry experts and executives do not consider a DCF a particularly important framework for valuing a company whose primary business is selling life insurance. A successful insurer can have massive (and misleading) outflows of cash in times of high sales volume, whereas a troubled, yet established, company can show sizeable positive cash flows because its in-force policy premiums overshadow small commission payments and other variable expenses resulting from low current sales. Jachym, an analyst with more than 20 years of experience in the insurance sector and who works for an investment bank that is a juggernaut in the financial services and insurance industries, chose to assign only a 2.5% weighting, no more than a token figure, to a DCF in his overall valuation of MONY. Therefore, while a properly conducted DCF analysis is typically granted substantial evidentiary weight by a court in an appraisal proceeding,[56] court will not utilize a pure DCF methodology in determining MONY's fair value.

## B. The Experts' Comparable Transactions Analyses

A comparable transactions analysis is an accepted valuation tool in Delaware appraisal cases. The analysis involves identifying similar transactions, quantifying those transactions through financial metrics, and then applying the metrics to the company at issue to ascertain a value.[57] The utility of the comparable transactions methodology is directly linked to the "similarity between the company the court is valuing and the companies used for comparison."[58] Because a testifying expert necessarily exercises a degree of subjective judgment in selecting the transactions he actually compares to the one at issue, a reviewing court must closely evaluate whether a party who relies on a comparable transactions analysis has met its burden of persuasion.

### 1. Shaked's Comparable Transactions Analysis

In his comparable transactions analysis, Shaked used dated transactions that occurred during a strong bull market in the late 1990s and early 2000s, the majority of which were five years removed from the closing of the AXA–MONY merger.[59] More detrimentally, however, Shaked relied on companies that were not directly comparable to MONY, while omitting from his analysis one highly probative transaction—the purchase of Safeco.[60] These dis-

**56.** *Crescent*, 2007 WL 1342263, at *9.

**57.** *In re United States Cellular Operating Co.*, 2005 WL 43994, at *17 (Del.Ch. Jan. 6, 2005) (citing *Dobler*, 2004 WL 2271592, at *8).

**58.** *Id.* (citing *Lane v. Cancer Treatment Centers of America, Inc.*, 2004 WL 1752847, at *34 (Del.Ch. July 30, 2004)).

**59.** Of the seven transactions Shaked classified as comparable, four were from 1999.

**60.** In Highfields's post-trial briefing, Shaked belatedly attempts to include the Safeco transaction in his comparable transactions analysis. This effort is procedurally inappropriate, and casts great doubt on Shaked's objective judgment considering he originally believed it was appropriate to ignore the Safeco transaction altogether. In any event, the court gives this dilatory tactic no weight, since Shaked still relies on other non-comparable transactions.

cretionary judgments resulted in a substantial overvaluation of MONY.

The Safeco transaction is temporally relevant to the AXA–MONY merger. It was announced in late September 2003 and closed in March 2004. Moreover, the consideration paid in the two transactions was similar. Perhaps most strikingly, the life insurance businesses of both companies suffered from low returns on equity, an influential factor in both companies being sold at substantial discounts to GAAP book value.[61]

Highfields's argument that the Safeco transaction is irrelevant because it involved a distressed sale at a significant marketability discount is simply makeweight. Goldman Sachs, a respected financial advisor, conducted an auction for Safeco.[62] Contemporaneous buy-side and sell-side actuarial appraisals conducted by prominent actuarial firms confirm that the discount from book value in the Safeco transaction was justified, and erodes Highfields's contention that Safeco was sold at a marketability discount.[63] Indeed, one would expect this to be the case, considering that Safeco's life insurance segment filed statutorily-required financial statements that were readily available to members of the investment community. For these reasons, the court finds Shaked's comparable transactions methodology unreliable and unpersuasive.

### 2. Jachym's Comparable Transactions Analysis

In his rebuttal report, Jachym criticizes as improper the use of a price-to-book value multiple in Shaked's comparable transactions model. However, it is Jachym's reliance on an implied price-to-

earnings multiple of 12.5x to value MONY that fails the test of reasonableness. This calculation resulted in an implied value for MONY of only $4.50 per share. Despite the fact that, in the court's view, no conceivable basis exists to assign any weight to such an outlying value of MONY, Jachym insisted it was sound judgment to weigh this figure at 30%. The powerful influence the $4.50 per share number imparted on his comparable transactions model unreasonably reduced the going-concern value Jachym derived for MONY.

Although the court could adjust the weight Jachym placed on the price-to-earnings multiple to reach an acceptable valuation for MONY, there remains an irreparable structural malady in Jachym's comparable transactions methodology-a failure to adjust the price-to-book value metric for each selected company's unrealized capital gains and losses. Under Financial Accounting Standard 115 ("FAS 115"), insurance companies are permitted to report losses in their investment portfolio without adjusting their book value to reflect those losses. If an adjustment is made for FAS 115, unrealized losses not yet booked will increase the reported book value of the firm. The effect of this adjustment, for present purposes, is a decrease in the insurer's price-to-book value multiple.

Despite the analyst and industry preference of evaluating a firm after making an FAS 115 adjustment, Jachym did not do so for his comparable transactions. In his presentation to the court at trial, Jachym assigned a ratio of .53x for the Safeco transaction, despite admitting on cross-examination that the multiple would increase

---

61. The Safeco transaction occurred at approximately 78% of book value, while the MONY transaction went through at roughly 72% of book value.

62. Trial Tr. 356–57.

63. JX 1222; JX 1251.

to .78x when adjusted for FAS 115. Although the court requested that Jachym reconfigure his model to compensate for this shortcoming, he was unable to do so because book value excluding FAS 115 is not publicly available for three of the six transactions he used. Therefore, the court finds that Jachym's comparable transactions analysis is irretrievably defective, and cannot form a legitimate basis from which to derive MONY's fair value.

### C. *The Experts' Comparable Company Analyses*

The comparable company valuation model involves "(1) identifying comparable publicly traded companies; (2) deriving appropriate valuation multiples from the comparable companies; (3) adjusting those multiples to account for the differences from the company being valued and the comparables; and (4) applying those multiples to the revenues, earnings, or other values for the company being valued." [64] When evaluating the utility of this methodology in a particular case, a court must consider the degree of similarity between the company valued and the companies compared, for "at some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes." [65]

### 1. *Shaked's Comparable Company Analysis*

Shaked's comparable company methodology suffers from the same problem the court found with his comparable transactions analysis-namely, the companies Shaked examined were not sufficiently comparable to MONY to render his work reliable for purposes of a Delaware appraisal proceeding. Using a price-to-book value metric,[66] Shaked placed MONY at the median of the bottom quartile in his model, assigning the company a multiple of .89x. This multiple is a 27% discount from Shaked's own comparable company median, and represents a 33% discount from the mean. Thus, Shaked's conclusion implicitly supports AXA's critique that his comparable company analysis is overly biased and subjective. In the past, other Delaware courts have found a comparable company metric to be unreliable where such a discrepancy is present.[67]

Shaked's calculation of a 30.1% control premium in his comparable company analysis, which he achieved by removing the implicit minority discount from the calculated stock price of MONY, was also conducted in a questionable fashion. None of the more than 50 transactions he examined, all of which involved a financial buyer taking the acquired company private, involved an insurance company. Indeed, only one transaction even involved a finan-

---

**64.** *Dobler*, 2004 WL 2271592, at *8 (quoting *Agranoff v. Miller*, 791 A.2d 880, 892 (Del.Ch. 2001)).

**65.** *Lane*, 2004 WL 1752847, at *34 (quoting *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del.Ch.1991)).

**66.** In deriving these ratios, Shaked used data from second quarter Form 10–Qs, an improper approach as this information was not publicly available as of July 8, 2004, and thus was not reflected in the market price of the companies as of that date.

**67.** *Dobler*, 2004 WL 2271592, at *11 (quoting *Taylor*, 2003 WL 21753752, at *9, for the proposition that by choosing a drastically reduced multiple, "[an expert] demonstrate[s] that he believes the guideline companies are not truly comparable," and rejecting a deviation of 48% as unreasonable); *Gotham Partners, L.P. v. Hallwood Realty Partners*, 855 A.2d 1059, 1076 & n. 31 (Del.Ch.2003) (discussing the dangers of significantly deviating from the mean or median of guideline companies' multiples because the analysis becomes too biased and subjective).

cial institution. The use of a pool of such dissimilar transactions, leaves the court with no confidence that Shaked's calculation of a 30.1% control premium was proper, particularly since he ignored the fact that financial buyers may also enjoy synergistic benefits from their acquisitions.[68] For these reasons, the court finds Shaked's comparable company methodology unreliable and gives it no weight.

### 2. *Jachym's Comparable Company Analysis*

As was the case with his DCF analysis, Jachym both explicitly (in his trial testimony) and implicitly (by weighing the metric at only 7.5% in his overall valuation) admits to the lack of real comparability between MONY and the other publicly traded life insurance companies examined in his comparable company model. The price-to-book value metric for Jachym's comparable firms, which he weighted at 60%, ranged from .54x to 1.36x. Jachym placed MONY at the bottom of this range.

This .54x multiple is a 40% discount from Jachym's own price-to-book value median, and represents a 41.4% discount from the mean. Jachym's comparable company analysis, then, bears the same hallmarks of unreliability Shaked's.[69]

Jachym's methodology is further undermined by contradictions in his trial testimony and his report. Jachym stated that the market did not value MONY on the basis of its earnings, and that it was not acceptable practice to derive stock values for an insurance company solely from earnings. Thus, Jachym's decision to rely heavily on price-to-estimated earnings multiples was unreasonable, particularly in light of market estimations of MONY's value.[70] By weighting an implied value of $10.70 per share at 40% in his comparable company analysis, Jachym unduly skewed downward the result obtained from this model.[71] Viewed with the shortcomings associated with his price-to-book value metric, the court rejects Jachym's comparable company analysis.[72]

**68.** *See, e.g., Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *5 (Del.Ch. June 15, 1995) (observing that the premium necessary to remove the inherent minority discount in a publicly traded stock is somewhere between zero and the full value of the control premium, and discounting available premium data which ranged from 34%–48% to 12.5% to account for synergies). As Jachym testified, even financial buyers have some synergies when making an acquisition, such as the ability to reduce the acquired company's cost of capital and to attract best-in-breed management and board members.

**69.** *Id.*

**70.** Market analysts suggested a stand-alone price for MONY in the mid-$20 range several months before the transaction closed. *See* note 49 *supra.*

**71.** Jachym ascribed 20% weight to an implied value per share of $8.26 based on price-to-2004 estimated earnings, and 20% weight to

an implied value of $13.14 based on price-to-2005 estimated earnings.

**72.** Despite the court's pointed questioning at trial, both Shaked and Jachym stood by their decisions to remove an implicit minority discount in MONY's stock when conducting their comparable company analyses. Although Delaware courts now seem to accept that the application of this valuation metric requires such an adjustment, the debate in the legal and financial community continues. *Compare* Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law* (Univ. of Penn. Inst. For Law & Economics, Research Paper No. 07–01), *available at* http://w4.stern.nyu.edu/clb/docs/Events/IMD—Draft—1–18–07.pdf *(arguing that the implicit minority discount has not gained general acceptance in the financial community)* and Richard A. Booth, *Minority Discounts and Control Premiums in Appraisal Proceedings, 57 BUS. LAW. 127, 148–51 (2001) (same) with John C. Coates IV, "Fair Value"*

### D. Shaked's Market Price Analysis

Although Shaked technically gave it no weight in his ultimate determination of MONY's fair value, he conducted a market price analysis as a purported test of reasonableness, and concluded that MONY's expected unaffected share price as of July 8, 2004 was $42.22. To arrive at this price, Shaked took what he believed was MONY's unaffected share price a month before the announcement of the merger ($28.20), eliminated a minority discount (30.1%), and then applied a beta multiple against the return of the L & H Index from the date of the merger announcement to the merger closing.[73]

As an initial matter, the court is convinced that MONY's stock price included an element of value reflecting merger speculation leading up to the September 17, 2003 announcement. MONY was well covered by analysts, and the evidence at trial overwhelmingly showed the market was aware that a transaction involving MONY would probably occur soon after the volume ownership restrictions on the company's stock expired in November 2003. Due to the extended period of time that this information was available, the court finds plausible Jachym's contention that a merger speculation premium was an imbedded condition in MONY's pre-September 17 stock price.[74]

The event study and the volume study conducted by Shaked, which form his basis for opining that MONY's stock price was unaffected, are not meaningful where such an imbedded condition exists.[75] Moreover, Shaked's assumption that MONY's stock price would move in direct proportion to an index is highly speculative. Significantly, Shaked admitted at trial that three of the seven companies on the L & H Index were not comparable to MONY, and that MONY historically underperformed those component companies.

Jachym testified that such an indexing technique was not commonly relied upon in the financial community. Indeed, Jachym said that, at least in his experience, indexing is unprecedented. This court has previously considered, and rejected, the explanatory power of a similar model.[76]

---

As An Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions, 147 U. PA. L. REV. 1251 (1999) (arguing that the elimination of an implied minority discount is, in some instances, appropriate).

73. The return on the L & H Index during this period was 21.7%. Shaked calculated a beta of 0.69, and thereby derived an expected return for MONY of 15.1% during the same time frame.

74. Additionally, the imbedded nature of this merger speculation condition would arguably render Shaked's addition of a minority discount to MONY's stock price an improper double-counting.

75. The predictive value of such analyses are granted great deference only in those situations where the market suddenly becomes aware of novel and previously unknown information about a particular security. See, e.g., Schwab v. Philip Morris USA, Inc., 449 F.Supp.2d 992, 1181 (E.D.N.Y.2006) ("According to the Efficient Capital Markets Hypothesis, securities prices in efficient market incorporate all available public information. One way to determine whether price incorporates new and relevant publicly available information is to conduct an event study . . . .") (emphasis added).

76. In Emerald Partners v. Berlin, 2003 WL 21003437 (Del.Ch. Apr. 28, 2003), the defendants' expert applied a discount based on decreases in the market capitalization of purportedly comparable companies to opine that the going-concern value of an appraised entity decreased in the time period between the November 30, 1987 merger announcement and the August 1988 merger closing. The court rejected that approach, noting that:

From a methodological standpoint, [the expert's] discount approach to valuing [the company] is highly problematic, because what it discounts is a going concern value

Finally, Shaked's market price analysis assumes, and wrongly so, that AXA's $31 offer acted as a market ceiling on MONY's stock price, rather than a floor. In reality, the latter is more likely. If the going-concern value of MONY was somehow depressed by AXA's bid during a time of highly favorable market conditions, the emergence of a topping bid would be all the more probable. For these reasons, the court finds Shaked's market price analysis flawed and will not consider it reliable in determining MONY's fair value.

### E. The AXA–MONY Transaction Provides A Reliable Basis On Which To Value MONY

As mentioned above, a court may derive fair value in a Delaware appraisal action if the sale of the company in question resulted from an arm's-length bargaining process where no structural impediments existed that might prevent a topping bid.[77] The court must, however, exclude synergistic elements from the sale price to arrive at a fair value.[78]

Jachym's decision to weigh the $31 per share merger price, less synergies, at 50% in his valuation analysis is both justified and not surprising. Clearly, the merger between AXA and MONY was an arm's-length transaction. No MONY officer or director participated in the buy-side of the

deal, and none of these individuals continued employment with AXA following the merger. The directors "consistently acted in an independent manner" throughout the merger process, and the three inside directors on MONY's board who stood to receive change-in-control payments recused themselves from the vote of the MONY board that approved the transaction.[79]

Of equal importance, no material impediments existed to prevent another bidder from entering the sale process for MONY during the eight-month period between the merger announcement and the MONY stockholder vote.[80] With a market check of this length, the court must conclude that any seriously interested bidder would have come forward, given that (1) AXA publicly stated that it would not increase its bid beyond $31 per share,[81] (2) industry analysts and executives understood that MONY was "in play,"[82] and (3) CSFB was unaware of any other entity that had an interest in acquiring MONY at a higher price.[83]

Highfields's contention that impediments to a topping bid existed does not bear scrutiny. Highfields says that substantial due diligence costs deterred a bidder from entering the process. However, a prospective buyer could have defrayed those costs through a hedging strategy,

---

based upon a decline in *market capitalization* of selected companies in the same industry. That method of valuation is counterintuitive, because (among other things) it assumes that each firm's going concern value has a constant relationship to the average market capitalization of all comparable firms within the same industry.... [This valuation approach] has *not been shown to* be generally accepted as valid in the business/financial valuation community. *Id.* at *35–36 (emphasis in original). That instruction applies with equal force to Shaked's model here.

**77.** *Union Ill.*, 847 A.2d at 357.

**78.** *Montgomery Cellular Holding Co. v. Dobler,* 880 A.2d 206, 220 (Del.2005).

**79.** *MONY II,* 853 A.2d at 667.

**80.** Trial Tr. 647–48; 774–75.

**81.** Trial. Tr. 646–47; JX 1405.

**82.** Durham Dep. 38–40; Foti Dep. 82–84, 233, 235.

**83.** *MONY I,* 852 A.2d at 22.

buying up to a 5% stake in MONY before surfacing an interest in making a competing bid. Indeed, if Highfields was actually convinced, despite offering no contemporaneous analysis prepared by its own employees as evidence in this case, that AXA's bid undervalued MONY by nearly $12 per share, it could have either made a topping bid by itself or as part of a group or encouraged a third party to do so.[84] If MONY was truly worth $43 per share, certainly some savvy investor likely would have competed with AXA, as each dollar per share below that level, according to Highfields's theory, would have resulted in the purchaser realizing approximately $50 million in value.[85]

The more logical explanation for why no bidder ever emerged is self-evident: MONY was not worth more than $31 per share because no prospective purchaser, either strategic or financial, stood to gain the synergies AXA anticipated in the merger, synergies which it was willing to share with MONY's stockholders.[86] On these facts, the transaction giving rise to this appraisal action is a solid indicator of MONY's fair value, and the court finds reasonable and appropriate Jachym's decision to grant the merger price great deference in his valuation analysis.

The court's determination on this point, however, is not entirely dispositive. The court must still account for the amount of shared synergies imbedded in the $31 per share merger price. The parties' positions on this issue differ. Highfields levels several meritorious attacks on Jachym's analysis, but fails to offer any alternative position on how synergies ought to be determined. Therefore, the court, exercising its independent business judgment, finds it appropriate to rely on Jachym's shared synergy calculations after certain adjustments.

Based on conclusions reached by industry analysts, CSFB, and AXA's management, Jachym opined that shared synergies represented at least 25% of the merger price, or $7.75 per share. Despite Jachym's view that a DCF methodology generally yields an unreliable valuation

---

**84.** Highfields was intimately familiar with investors who might have been willing to purchase an undervalued insurance company, since it participated in the Safeco transaction in the same time frame as the AXA–MONY merger. Furthermore, Highfields had significant financial resources available with which to acquire a highly undervalued firm. Just seven months following the merger, Highfields made a $3.25 billion cash offer for 100% of Circuit City, Inc.

**85.** It seems that much of this discrepancy between the merger price and Shaked's valuation results from Highfields's view that MONY's DAC and goodwill were improperly discounted by $600 million. The evidence shows that this financial accounting-purchase accounting substitution, however, was little more than an accounting game which, when implemented, has the effect of driving up valuation metrics based on earnings, while driving down metrics based on book value. In any event, the valuation techniques the court ultimately uses to determine the fair value of MONY's shares (sum-of-the-parts and shared synergies) are not directly dependent on the DAC write-down. For instance, with respect to the shared synergies approach, investors and the marketplace were aware of the $600 million adjustment because it was included in the proxy statement issued in connection with the merger. If this adjustment vastly understated MONY's fair value, then a topping bidder would have had all the more reason to enter the fray and compete with AXA to purchase the company.

**86.** *See MONY I*, 852 A.2d at 22 ("Using these resources and the considerable body of information available to it, the board determined that because MONY and AXA share a similar business model, the career agency distribution system, and have complementary products, AXA was a 'perfect fit' for MONY, and thus presented an offer that was the best price reasonably available to stockholders.").

result in the insurance company context, and despite the fact that, in conducting his own broader valuation analysis, Jachym never relied on CSFB's February 2004 board presentation, he did rely on those materials in calculating shared synergies. The court finds this reliance improper.

AXA's view of the synergistic elements of the transaction are likely more reliable in Jachym's sum-of-the-parts analysis. Jachym relied heavily on the actuarial assumptions in AXA's September 2003 valuation of MONY, which lends credence to the synergy estimations contained in AXA's valuation. Trial testimony also showed that the September 2003 valuation was not of the typically skewed, buy-side variety: rather, it was an objective study created by a team of actuaries whose professional standards require neutrality.[87] It is therefore reasonable to assume that, based on its September 2003 valuation of MONY, AXA viewed the lower end of shared synergies in the transaction at $9.54.[88]

The synergy figures, however, must take into account certain discrepancies between AXA's September 2003 valuation and Jachym's sum-of-the-parts valuation (the

only other legitimately conducted valuation metric presented in this litigation) as of the transaction closing date. Essentially, AXA's good faith estimations in September 2003, according to a corrected version of Jachym's later analysis, undervalued MONY by approximately $5.42 per share.[89] Therefore, AXA's calculation of shared synergies as $9.54 per share must be adjusted downward to $4.12 per share, with the result being a merger price, less shared synergies, of $26.88 per share. For the above reasons, the court will weigh this figure at 75% in determining MONY's going concern value as of July 8, 2004.[90]

## F. Jachym's Sum–Of–The–Parts Analysis Provides A Reliable Valuation

Jachym's sum-of-the-parts analysis consisted of four distinct calculations: (1) an actuarial appraisal to value MONY's life insurance and annuity business; (2) a blended comparable company and comparable transactions approach to value MONY's broker-dealer subsidiary; (3) a weighted discounted cash flow and comparable company metric to value MONY's asset management business; and (4) a standard accounting approach to value

---

87. Actuarial work in the insurance context, of course, stands in contrast to the often biased valuation work presented to opposing boards by investment bankers representing a particular company.

88. JX 167 at 55.

89. AXA did not place a value on MONY's term life business as part of its September 2003 analysis, and Jachym testified that this value should have been approximately $97,887,259. Additionally, Jachym's report shows that AXA undervalued MONY's broker-dealer subsidiary by $145,940,000 and its fund management group by $57,996,785. However, Jachym calculated MONY's corporate debt at a higher figure than AXA by $27,972,935. Together, these figures represent approximately $5.42 for each of the 50,521,772 shares outstanding at the time of the merger. These

modifications are discussed in greater detail later in this opinion.

90. Highfields's argument that the shared synergies approach is improper because the synergy calculation only represents synergies to AXA as a particular buyer is unpersuasive. Synergies resulting from a transaction are always buyer-specific, and will fluctuate depending on efficiencies and expense savings a purchaser can achieve. Yet this fact has no real bearing on a company's going-concern value, since the synergies are always subtracted out from the merger price. Indeed, acceptance of this argument would cast great doubt on the entire line of Delaware cases that assume an arm's-length transaction price, less synergies, is strong evidence of fair value.

MONY's corporate assets and liabilities. For the reasons that follow, the court finds this methodology, with slight modifications, a reliable means of deriving MONY's fair value since such a metric is standard procedure in the financial community when valuing an insurance conglomerate consisting of diverse lines of business where no directly comparable companies or transactions exist.

### 1. *The Life Insurance And Annuity Business*

Jachym's valuation of MONY's life insurance and annuity business consisted of an actuarial appraisal. He determined that, as of July 8, 2004, MONY's statutory net asset value was $1,020,390,155, while the value of its in-force business was $74,673,875. Jachym also opined that the present value of MONY's new business was $97,887,359. Thus, this component of his sum-of-the-parts analysis is worth $1,192,951,290.

As Jachym testified, an actuarial appraisal is the preferred valuation methodology in the insurance industry. Highfields's witnesses did not contradict this assertion. Strangely, Highfields offered no alternative actuarial appraisal in this litigation, despite relying on actuarial analyses when it invested in the Safeco transaction. Instead, it labels Jachym's testimony incompetent because AXA, not Jachym, created the assumptions underlying the actuarial model. Moreover, Highfields contends that Jachym's analysis improperly relied on stale projections created by MONY management. Under

scrutiny, however, both of these points are unpersuasive.

The evidence at trial overwhelmingly showed that Jachym's reliance on the actuarial assumptions used in AXA's model was reasonable. His team conducted extensive interviews with AXA's actuarial staff to vet those assumptions. Not only was the Jachym's work with AXA more extensive than the work done on one of his typical valuation engagements, but the questions his team posed to AXA's actuaries were materially similar to those AXA asked of MONY's actuarial staff during its due diligence inquiry. Additionally, the court does not find it troublesome, given the particular type of business being valued in this case, that a prospective buyer created the actuarial assumptions used by Jachym. In the insurance business, actuaries act as neutral evaluators whose professional obligations and reputations depend upon the objectivity of their work product.

Moreover, the court finds that Jachym reasonably updated MONY's management projections as of July 8, 2004. Jachym determined the company's net asset value component based on statutory filings MONY submitted to state regulators on June 30, 2004. For MONY's in-force business, Jachym testified that he adjusted MONY's post-tax earnings and expenses to bring those figures in line with the closing date of the merger, and also eliminated certain downward adjustments made by AXA. Finally, the court agrees with Jachym's assessment that the company would not be able to write profitable business in the future (other than its specialty products line).[91] Therefore, the court

---

91. Highfields argues that Jachym essentially adopted AXA's assumptions on this point, and that those assumptions were wrong because they assigned a zero value to MONY's future business only because AXA planned to discontinue selling MONY products after completion

of the merger. This argument is unpersuasive for two reasons. First, Jachym did estimate a positive value $97,887,359 for MONY's new business, although that amount solely derives from the company's specialty products line. Second, as to other insurance

finds that the valuation conclusions Jachym reached with respect to MONY's life insurance and annuities business are reasonable and are supported by competent evidence.

## 2. The Broker–Dealer Business

Jachym's decision to employ a weighted average of comparable transactions (66.7%) and comparable company (33.3%) analyses to value MONY's broker-dealer business was justified methodologically, particularly since reliable, contemporaneous projections for this business segment were not available. Indeed, Highfields did not specifically argue with Jachym's decision to employ these two models, nor did it note any impropriety in his choice of comparable companies and transactions.

The court does find, however, that Jachym erred in placing weight on backwards-looking earnings metrics in both of these models. In Jachym's comparable company analysis, this particular multiple, which was assigned a 20% weight, valued the broker-dealer business at $113.8 million.[92] In his comparable transactions analysis, this specific metric, weighted at 22.2%, implied values of $99.1 million and $100.4 million.[93] As Jachym readily admitted at deposition and at trial, these figures are outliers in each model, and there is no likelihood that they accurately estimate the fair value of the broker-dealer subsidiary. Exercising its business judgment, the court must remove these values from Jachym's analysis, and finds that the fair value of the broker-dealer business as of July 8, 2004 was $345.94 million.[94]

## 3. The Asset Management Business

To value the asset management segment of MONY, Jachym conducted a DCF analysis and a comparable company analysis, which he then weighted at 60% and 40%, respectively. At trial, the Highfields expert witnesses offered no material criticism of Jachym's valuation of the asset management business, and gave no alternative valuation. Instead, Highfields argues that Jachym improperly relied upon AXA projections in his DCF analysis. This assertion is incorrect because the projections Jachym used were based on historical and projected figures obtained from MONY's management.

As Jachym admitted at trial, however, the projections used for both the DCF and the comparable company models were denominated in euros rather than dollars.

---

and annuity products, MONY's prospects of ratings downgrades and its lack of a competitive position in the marketplace meant that its future run-of-the-mill insurance underwriting would *not* generate a positive return. As Jachym testified, although writing unprofitable business seems foolish from an economic standpoint, MONY would have continued to do so to keep its moderately profitable in-force business from fleeing and to maintain its distribution system. Trial Tr. 841–45, 853–60. *See also id.* at 642, 679–80 (Stanley Tulin commenting that although MONY was selling products, it was not making money off of what it was selling); Daddario Dep. 241–42 (explaining that, in the event of a ratings downgrade, MONY might need to sell business at a loss to maintain its distribution network); Stoddard Dep. 196–97 (noting that CSFB believed MONY would not be able to write profitable future business over the long term).

92. The other metrics returned values of $389 million, $307.5 million, $271.6 million, and $349.5 million. Without the backward-looking earnings metric, the comparable company analysis implies a value of $382.4 million.

93. The other metrics returned values of $286.3 million, $381.9 million, $314.0 million, and $640 million. Without the backward-looking earnings metric, the comparable transactions analysis implies a value of $327.7 million.

94. This figure is achieved by the following formula: ($327.7 million × (2/3)) + ($382.4 million × (1/3)) = $345.94 million.

Recalculating this figure results in a $24,538,425 increase in the going-concern value of the asset management business.[95] Thus, the court finds that the proper value of that operation is $117,996,785 as of July 8, 2004.

In sum, an adjusted sum-of-the-parts valuation for MONY results in a total value for the company of $970,915,140 as of July 8, 2004, or $19.22 per share.[96] Using its independent business judgment, the court weights this figure at 25% in its determination of MONY's going-concern value.

## V.

By weighting the modified shared synergies analysis at 75% and the modified sum-of-the-parts analysis at 25%, the court finds that Highfields is entitled to $24.97 for each share of MONY stock it held on July 8, 2004.[97] Counsel for AXA is instructed to submit, on notice, a final form of order in accordance with this opinion (including a provision for the parties' agreed upon rate of interest) within 10 days.

95. Jachym testified that changing the denomination would result in a $0.17 increase in his overall estimated value of MONY (i.e. from $20.80 to $20.97). The court must back this figure out of Jachym's overall analysis to determine the error's effect on his sum-of-the-parts model. Because Jachym weighted the sum-of-the-parts at 35% overall, the true distortion in the model is $0.4857 per share (solving for "X" in the equation: X = $0.17/.35). Thus, the overall adjustment is $0.4857 multiplied by the number of outstanding shares (50,521,772) to arrive at $24,538,425.

96. This figure is calculated by adding the life insurance and annuity value ($1,192,951,290) with the broker-dealer value ($345,940,000) and the asset management value ($117,996,-785). Corporate assets and liabilities are then subtracted ($685,972,935). There is no dispute regarding Jachym's calculation of the corporate assets and liabilities of MONY.

97. ($26.88 × .75) + ($19.22 × .25) = $24.97.